2018 IL App (2d) 170185
No. 2-17-0185
Opinion filed January 19, 2018

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| FAMILY AMUSEMENT OF NORTHERN ILLINOIS, INC., and RICHARD E. GRAP, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | No. 16-L-174 |
| ACCEL ENTERTAINMENT GAMING, LLC, f/k/a Accel Entertainment, LLC, and Accel Gaming LLC; THE ILLINOIS GAMING BOARD; DONALD R. TRACY, HECTOR ALEJANDRE, THOMAS A. DUNN, and DEE ROBINSON, in Their Official Capacities as Members of the Illinois Gaming Board; and MARK OSTROWSKI, in His Official Capacity As Administrator of the Illinois Gaming Board, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants | ) ) | |
| (The Illinois Gaming Board; Donald R. Tracy, Hector Alejandre, Thomas A. Dunn, and Dee Robinson, in Their Official Capacities as Members of the Illinois Gaming Board; and Mark Ostrowski, in His Official Capacity as Administrator of the Illinois Gaming Board, Defendants-Appellants). | ) ) ) ) ) ) ) ) | Honorable J. Edward Prochaska, Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices Hutchinson and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1    This is an appeal from the trial court's rulings of February 1, 2017, which denied the request of the defendants the Illinois Gaming Board and its members (collectively, the Gaming Board or the Board) to dismiss the counts against them in the complaint filed by the plaintiffs, Family Amusement of Northern Illinois, Inc. (Family), and Richard E. Grap (collectively, FA), and granted summary judgment in favor of FA on one of its requests for declaratory judgment. We affirm in part and reverse in part.

¶ 2                                I. BACKGROUND

¶ 3    In 2009, the legislature enacted the Illinois Video Gaming Act (Act) (230 ILCS 40/1 *et seq.* (West 2016)). The Act created a comprehensive regulatory scheme legalizing, for the first time, gambling via video-gaming terminals. See *J&J Ventures Gaming, LLC v. Wild, Inc.*, 2016 IL 119870, ¶ 3. The Act gave the Gaming Board broad powers to supervise video-gaming operations. *Id.* ¶ 32. Under the statute, the Gaming Board "has all powers necessary and proper to effectively execute the provisions of the Act," including "the authority to adopt regulations for the purpose of administering the Act and 'to provide for the prevention of practices detrimental to the public interest and for the best interests of video gaming.' " *Id.* ¶ 3 (quoting 230 ILCS 40/78(a)(3) (West 2014)).

¶ 4    Section 45(a) of the Act requires licensing by the Gaming Board for any person or entity wishing to manufacture, distribute, supply, operate, or handle video-gaming terminals and for any establishment wishing to have a video-gaming terminal on its premises. 230 ILCS 40/45(a) (West 2016). The Gaming Board cannot issue a license to any person having "a background, including a criminal record, reputation, habits, social or business associations, or prior activities that pose a threat to the public interests of the State or to the security and integrity of video gaming." 230 ILCS 40/45(d)(1) (West 2016). The Act provides that the Board "may adopt

rules to establish additional qualifications and requirements to preserve the integrity and security of video gaming in this State." 230 ILCS 40/45(e) (West 2016).

¶ 5    In early 2016, the Gaming Board adopted section 1800.330(b) of Title II of the Illinois Administrative Code (Video Gaming Rule 330), which allows the Board, after an investigation, to enter an order of "economic disassociation," essentially requiring a licensee to stop doing business with a specified person.   See 11 Ill. Adm. Code 1800.330(b) (eff. Jan. 27, 2016). Persons from whom a licensee can be ordered to disassociate are identified in section 1800.220 of the Illinois Administrative Code (Video Gaming Rule 220) and include anyone who acts as a sales agent or broker for the licensee or who "otherwise engage[s] in the solicitation of business from current or potential licensed video gaming locations."   11 Ill. Adm. Code 1800.220(a), (e)(2) (eff. Feb. 16, 2016).   The Gaming Board can issue a disassociation order under the same circumstances that would justify the denial of a license under section 45(d) of the Act or section 9 of the Riverboat Gambling Act (230 ILCS 10/9 (West 2016)).   11 Ill. Adm. Code 1800.330(c) (eff. Jan. 27, 2016).   Any person affected by a disassociation order can request an administrative hearing to contest it.   11 Ill. Adm. Code 1800.330(b) (eff. Jan. 27, 2016).

¶ 6    Defendant Accel Entertainment Gaming, LLC (Accel), is a licensed terminal operator under the Act and may own, service, and maintain video-gaming terminals.   Family is in the business of supplying "nongaming amusements" and devices, including coin-operated video-game machines, jukeboxes, dart boards, pool tables, and the like.   This "soft equipment" is not subject to oversight under the Act.   Grap is Family's sole shareholder.   Grap is a licensed terminal handler under the Act.   However, Family is not licensed to own, operate, distribute, supply, or service video-gaming terminals.

¶ 7    In 2010, Accel and FA entered into a referral contract under which FA agreed to serve as a sales agent, soliciting sites for the placement of Accel's video-gaming terminals.   Once FA

obtained a commitment for a site, the site's owner and Accel would enter into a "terminal" or "use" agreement governing the actual placement of the video-gaming terminal. Under the referral contract, FA received commissions for successfully obtaining new sites for terminals and for renewals of terminal agreements, and it received ongoing monthly payments based on the total number of terminals in place. In addition, FA was to receive a large bonus for each terminal 10 years after the date on which the terminal "went live." The first terminals "went live" in 2013, so the first such bonus payment was not due until 2023.

¶ 8    On May 25, 2016, Grap was arrested and charged with the crime of possessing multiple illegal gambling devices that were found in FA's warehouse, a violation of section 35(a) of the Act (230 ILCS 40/35(a) (West 2016)). (Section 35(a) requires all video-gaming terminals to be licensed and prohibits the possession of certain types of gaming devices, including those capable of removing credits that were awarded through the operation of chance.) As a result of this arrest, on June 2, 2016, the Gaming Board voted to issue Accel a disassociation order (Disassociation Order or Order) regarding FA.

¶ 9    The Order was issued on June 6, 2016, and required Accel to immediately "economically disassociate" from FA. In the Order, the Gaming Board stated that it was invoking its authority under Video Gaming Rule 330. The Order also cited section 45 of the Act and section 9 of the Riverboat Gambling Act.

¶ 10    The Order required Accel to confirm that it had disassociated from FA. In addition, the Order prohibited Accel from making "any additional payments" to FA. The Order concluded by advising Accel and FA that they had the right to file responses within 21 days and that, if they did so, a hearing officer would be appointed and a hearing would be held.

¶ 11    The language barring Accel from making "any additional payments" to FA proved to be a flash point. Although the Gaming Board did not know this when it entered the Order, in

addition to serving as a sales agent for Accel under the referral contract, FA had several other agreements with Accel, some of which FA contended were unrelated to gaming. (These agreements are detailed below.) In complying with the Order, Accel not only ceased employing FA as a sales agent, it stopped making payments under all of these agreements.

¶ 12 FA reacted swiftly. On June 17, 2016, FA filed a lawsuit in the circuit court of Winnebago County against Accel and the Gaming Board. The two counts directed against the Gaming Board sought (1) judgments declaring that the Gaming Board had exceeded its statutory authority in issuing the Disassociation Order and that, even if it had not, the Order was void, and (2) an injunction preventing the Gaming Board from enforcing the Order or requiring the cessation of payments from Accel to FA. FA also filed a petition for a temporary restraining order (TRO). On June 21, the trial court heard oral argument on the petition for a TRO and denied it.

¶ 13 A week later, FA also took action in the administrative proceeding, filing responses to the Disassociation Order. The responses noted that Grap was contesting the criminal charges against him and denied that the business relationship between FA and Accel posed a threat to the integrity of gambling in Illinois. FA also asked that the administrative proceeding be stayed until the criminal charges against Grap had been resolved. The Gaming Board agreed to stay the administrative proceeding pending resolution of the criminal charges.

¶ 14 FA then filed an amended complaint in the circuit court. Four of the six counts were directed to Accel and alleged that Accel had breached various agreements with FA, including (1) the referral contract (as amended over time); (2) a promissory note in the amount of $1,035,000, representing a debt owed by Accel to FA under the referral contract (the note was not due until 2020, but FA claimed that Accel's alleged breach of the referral contract was a default that triggered immediate repayment); (3) an automated-teller-machine (ATM) agreement

under which FA solicited ATM placement agreements on behalf of Accel in return for quarterly commission payments based on the number of successful transactions performed at each ATM placed by FA; and (4) an asset-sale agreement under which Accel bought some nongaming assets (soft equipment) from FA for $300,000 plus interest, to be paid over three years.

¶ 15    As before, the two counts against the Gaming Board included requests for declaratory judgment (count V) and injunctive relief (count VI).   In count V, FA asserted (1) that the Gaming Board lacked any statutory authority to require Accel to disassociate from FA or, (2) in the alternative, that the Board exceeded its authority by requiring Accel to stop making "any additional payments" to FA.   FA alleged that this language barred not only future payments under the referral contract but also payments of amounts owed under the promissory note and "for services and equipment" already provided to Accel.

¶ 16    The Gaming Board moved to dismiss the counts against it, arguing that the trial court lacked jurisdiction to hear them, because FA had not exhausted its administrative remedies. The Board pointed out that the administrative proceeding was still pending (albeit stayed, at FA's request) and the agency had not issued a final decision.   Further, the doctrine of exhaustion of administrative remedies required FA to pursue relief through administrative procedures before seeking judicial review.   FA responded that it was not required to exhaust its administrative remedies because it was attacking the statutory authority of the Gaming Board.

¶ 17    At the same time, FA moved for summary judgment in its favor on count V, the requests for declaratory judgment.   FA argued that the Gaming Board lacked any statutory authority to issue Video Gaming Rule 330 (the regulation permitting the issuance of disassociation orders) or, if it had such authority, it lacked the authority to issue such an order against a nonlicensee under the Act, such as a sales agent.   FA also argued that, even if the Gaming Board had the authority to issue a disassociation order against a sales agent, it exceeded its authority in issuing

the Order here, because it prohibited Accel from making future payments to FA "without regard to the basis for these payments, their relation or lack thereof to video gaming, or the equity between the parties." FA argued that the Order was not only overbroad, it impaired FA's constitutional rights, including its freedom of contract. In an affidavit attached to the motion, Grap averred that Accel owed FA more than $2.6 million as the result of its alleged breaches. (Most of this claimed loss arose from two large payments scheduled to be paid years in the future—the $1,035,000 promissory note, originally due in 2020, and $1.2 million in "bonus payments" due to commence in 2023 under the referral contract.)

¶ 18     After hearing oral argument on both motions and taking the matter under advisement, the trial court issued an oral ruling on February 1, 2017. The court began by denying the Gaming Board's motion to dismiss, holding that FA was not required to exhaust its administrative remedies before seeking judicial review of the Order because FA had challenged the Gaming Board's statutory authority to issue the Order. The trial court also stated that it could address the issues raised in the complaint, because those issues were purely legal and did not require the adjudication of any disputed facts or the application of any special expertise that the Gaming Board might have. In making this statement, the trial court did not differentiate between FA's request for a declaratory judgment on a point of law (*i.e.*, the Gaming Board's statutory authority) and its request that the trial court review the validity of the Order.

¶ 19     The trial court then addressed FA's motion for summary judgment on its requests for declaratory judgment. As to FA's argument that the Gaming Board lacked any statutory authority to issue Video Gaming Rule 330 or, if it had such authority, it lacked the authority to issue a disassociation order against a sales agent, the trial court ruled against FA. Quoting from section 45(d) of the Act, the trial court held that the legislature had intended for the Gaming Board to have broad authority to issue rules in order to safeguard against "the dangers of

unsuitable, unfair, or illegal practices, methods, or activities in the conduct of video gaming." 230 ILCS 40/45(d) (West 2016). Accordingly, the adoption of Video Gaming Rule 330 (and Video Gaming Rule 220, which defined those persons whose conduct the Board could regulate) was within the power of the Board. As a sales agent, FA was within the scope of these rules. Further, FA clearly received a financial benefit from video-gaming activity through its relationship with Accel, and thus the Gaming Board had the authority to order Accel to disassociate from FA. The trial court held that, both on its face and as applied in the context of the Disassociation Order, the Act authorized the Board to adopt Video Gaming Rule 330 and to issue the Order.

¶ 20 The trial court then addressed FA's argument that the Gaming Board exceeded its authority by issuing this specific Disassociation Order because the Order prohibited Accel from making "any additional payments" to FA, a phrase that was broad enough to encompass payments under agreements for goods or services that had already been provided or that FA contended were unrelated to video gaming. The trial court found that, by including this language, the Order exceeded the Gaming Board's statutory authority:

> "Had they stopped and not included that last sentence, I don't think we'd be here today and I don't think I'd be entering the order that I'm entering today. But by throwing in that last sentence prohibiting Accel from making any additional payments to Mr. Grap or Family Amusements that's where they exceeded their authority."

In the course of announcing this ruling, the trial court stated its belief that "a majority of that money that is owed to Mr. Grap and his *** company is unrelated to the video gaming industry" and was owed under "contracts that are unrelated to video gaming." The trial court stated that, under section 78 of the Act, "the Board's authority [was] confined to video gaming operations"

and was "limited to those actions which [were] necessary and proper to fully and effectively execute the provisions of the Act."

¶ 21    The trial court also held that the language prohibiting any additional payments to FA had the effect of prohibiting payments due for goods and services that had already been provided by FA, an effect that the court found was likewise beyond the power of the Gaming Board: "preventing Accel from paying for work previously performed prior to the entry of the disassociation act [*sic*] does not protect the video gaming market in Illinois."   Further, prohibiting payments for past performance was inequitable, giving Accel a windfall by allowing it to retain the benefits of its agreements with FA while relieving Accel of its obligations under those agreements.

¶ 22    The trial court then asked the parties for their views on whether it should strike the offending language from the Disassociation Order or simply declare the entire Order void.   The Gaming Board began by noting that it had never had the opportunity to receive evidence regarding the agreements so that it could amend the Order as needed: it had not known of all the agreements between Accel and FA when it issued the Order, and shortly after that the administrative proceeding was stayed at FA's request.   Thus, the Gaming Board had not formally considered alternative wording and the best course would be to remand for the Board to narrow the Order as needed.   Or, the court could strike the offending language, or add wording limiting the "additional payments" phrase to only those payments related to video gaming.   FA opposed this, arguing that the trial court should simply declare the Order void in its entirety. The trial court accepted FA's argument and declared the Order void.

¶ 23    At the close of its oral ruling, the trial court entered a written order stating that, for the reasons stated on the record, the Gaming Board's motion to dismiss was denied and FA's motion for summary judgment was granted.   The latter portion of the order was not entirely accurate, as

in its oral ruling the trial court *denied* the portion of the motion for summary judgment seeking a declaration that the Gaming Board had lacked statutory authority to issue Video Gaming Rule 330 or to issue a disassociation order against a sales agent such as FA. Oral rulings control over any conflicting written order (*Centrue Bank v. Voga*, 2017 IL App (2d) 160690, ¶ 37), and so we will disregard any contrary portion of the written order. The written order also declared the Disassociation Order void. Finally, the trial court entered a finding under Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016). The Gaming Board filed this appeal.

¶ 24                                  II. ANALYSIS

¶ 25    At oral argument on appeal, the Gaming Board conceded that the trial court had jurisdiction to rule on FA's request for a declaratory judgment on the Board's statutory authority to issue a disassociation order against a sales agent. However, the Board argues that the trial court erred in denying its motion to dismiss that portion of count V seeking judicial review of the Disassociation Order, because the court lacked jurisdiction to review that nonfinal administrative decision until the administrative proceeding had been pursued to its end. FA's opposing argument is that, because part of count V raised the legal issue of the Board's statutory authority, the trial court had jurisdiction to consider *all* of the issues raised in the count. FA is incorrect. The trial court had jurisdiction to hear that portion of count V seeking a declaratory judgment regarding the Board's authority to issue a disassociation order against a sales agent. However, it had no power to review the Disassociation Order itself or to declare the Order void.

¶ 26                          A. The Doctrine of Exhaustion

¶ 27    Under the doctrine of exhaustion of administrative remedies, "a party aggrieved by an administrative decision ordinarily cannot seek judicial review without first pursuing all available administrative remedies." *County of Knox ex rel. Masterson v. Highlands, L.L.C.*, 188 Ill. 2d 546, 551 (1999).

"The exhaustion doctrine includes administrative review in the circuit court. *Where the Administrative Review Law is applicable and provides a remedy, a circuit court may not redress a party's grievance through any other type of action.* The court's power to resolve factual and legal issues arising from an agency's decision must be exercised within its review of the agency's decision and not in a separate proceeding." (Emphasis added.) *Id*. at 551-52.

¶ 28 "There are three basic reasons for requiring a litigant to exhaust administrative remedies before seeking judicial review: (1) exhaustion allows full development of the facts before the agency; (2) it allows the agency an opportunity to use its expertise; and (3) the aggrieved party may succeed before the agency, rendering judicial review unnecessary." *Emerald Casino, Inc. v. Illinois Gaming Board*, 346 Ill. App. 3d 18, 25 (2003) (citing *Illinois Bell Telephone Co. v. Allphin*, 60 Ill. 2d 350, 358 (1975). The supreme court has emphasized that, historically, it has "strictly required adherence to the doctrine of exhaustion of remedies." *Castaneda v. Illinois Human Rights Comm'n*, 132 Ill. 2d 304, 330 (1989).

¶ 29 When the exhaustion requirement applies, the circuit court lacks jurisdiction to hear a challenge to an administrative decision and the complaint must be dismissed. See *id.* (affirming dismissal for failure to exhaust administrative remedies); *People ex rel. Fahner v. American Telephone & Telegraph Co.*, 86 Ill. 2d 479, 489 (1981) (same). Thus, exhaustion is a matter that may be raised through a motion to dismiss, as the Gaming Board did here. See 735 ILCS 5/2-619(a)(1) (West 2016). We review *de novo* the trial court's ruling on a motion to dismiss. *DeLuna v. Burciaga*, 223 Ill. 2d 49, 59 (2006).

¶ 30 B. The Facial-Challenge Exception

¶ 31 There are several recognized exceptions to the exhaustion requirement. One such exception is that a party need not exhaust its administrative remedies before seeking a judgment

declaring that the agency lacked the statutory authority to issue the decision at all. "[W]here the agency rule or order is being challenged on its face as not being authorized by statute," that issue may be determined via a declaratory judgment action. *Newkirk v. Bigard*, 109 Ill. 2d 28, 35 (1985). This is because, when a facial challenge is raised, "[j]udicial determination of th[e] question of law *** will affect the jurisdiction of the administrative agency in all cases," not merely under the particular circumstances of the case at hand. *Gallaher v. Hasbrouk*, 2013 IL App (1st) 122969, ¶ 19.

¶ 32　A facial challenge to an administrative order asks whether the order, "on its face, was authorized by statute." *Newkirk*, 109 Ill. 2d at 37. The case of *Masterson*, 188 Ill. 2d at 552-23, is an instructive example of the application of this exception. There, a landowner whose construction permit for a large hog-confinement facility was canceled by a zoning board of appeals (ZBA) sued the ZBA, seeking a declaratory judgment. The landowner alleged that the permit cancellation was beyond the statutory power of the ZBA because the Counties Code provided that agricultural purposes were exempt from zoning regulations. *Id.* at 550. The supreme court held that this assertion raised a facial challenge to the administrative action and that thus the trial court had jurisdiction to entertain the suit despite the landowner's failure to exhaust its administrative remedies. *Id.* at 555.

¶ 33　A facial challenge was also presented in *Emerald*. In that case, after the Gaming Board denied Emerald's application to move its riverboat casino to a new location, the General Assembly amended section 11.2 of the Riverboat Gambling Act (230 ILCS 10/11.2 (West 2002)) to provide that the Gaming Board "shall" grant such an application. Emerald submitted a revised application, but the Board denied it. Emerald then filed a declaratory judgment action, seeking a ruling that the Board had no authority to deny the application, because Emerald met

the criteria in section 11.2. The trial court granted summary judgment in favor of the Gaming Board. *Emerald*, 346 Ill. App. 3d at 21-22.

¶ 34 On appeal, the reviewing court first considered whether the trial court had had jurisdiction to render a decision, given that Emerald had not exhausted administrative appeal procedures. The court held that the facial-challenge exception applied, because the only issue before the trial court was a purely legal one of statutory interpretation: whether, under the statute as amended, the Board had "no authority to do anything other than fulfill a legislative directive." *Id*. at 25.

¶ 35 In both *Masterson* and *Emerald*, the agency's lack of authority to issue the order in question was apparent from the face of the order and the language of the relevant statute. See *Masterson*, 188 Ill. 2d at 555; *Emerald*, 346 Ill. App. 3d at 25. (In fact, in those cases, the relevant statutes expressly provided that the agencies *could not* enter the orders they did.) The trial courts in those cases thus had jurisdiction to entertain the plaintiffs' declaratory judgment actions under the facial-challenge exception. However, as explained below, this exception does not extend to a situation in which the administrative order was flawed or erroneous but nevertheless within the authority of the agency to issue. In such a case, the trial court lacks jurisdiction to review the administrative order and must dismiss the complaint as barred by the doctrine of administrative exhaustion.

¶ 36 In *Newkirk*, our supreme court outlined the limits of the facial-challenge exception. There, the plaintiffs attacked an administrative order, seeking a judgment declaring that issuing it was beyond the authority of the agency because it did not contain certain provisions that were required by statute. The supreme court held that the order's flaws did not excuse the plaintiffs' failure to exhaust their administrative remedies, because, even though the flaws were apparent from the face of the order, the flaws did not place the order beyond the power of the agency to

issue. *Newkirk*, 109 Ill. 2d at 34 ("The fact that the order is defective *** does not mean that the mining board was without jurisdiction to issue the order."). The agency had personal jurisdiction over the plaintiffs, who had been served with notice of the administrative hearing and invited to participate, and it had the equivalent of "subject matter jurisdiction," having the authority to issue orders of the general class at issue. *Id.* at 36-37. Finally, the agency had "the inherent authority to enter the order" in question. *Id.* at 37. Because the order was not beyond the agency's statutory authority to issue, the order could not be collaterally attacked in court as "void" and instead must be challenged through administrative procedures as erroneous ("voidable"). *Id.* at 40.

¶ 37 Notably, having answered the question of whether the facial-challenge exception applied, the supreme court did not go on to address the effect of the defects in the order. See *id.* ("we express no opinion as to whether the failure to include the omitted provisions rendered the entire order or merely a portion of it voidable"). Instead, the supreme court affirmed the trial court's dismissal of the complaint for failure to exhaust administrative remedies (*id.*), leaving the question to be determined in the first instance by the administrative agency itself.

¶ 38 With this outline of the exhaustion requirement and the facial-challenge exception in mind, we turn to the issues raised in this appeal.

¶ 39 C. The Board's Statutory Authority to Issue a Disassociation Order Against a Sales Agent

¶ 40 As we have noted, count V of FA's complaint essentially sought *two* declaratory judgments. First, FA sought a ruling on whether the Gaming Board had the power under the Act to adopt Video Gaming Rule 330 and to issue a disassociation order against a sales agent. Second, it sought a ruling on the validity of the Disassociation Order, which FA contended was beyond the power of the Gaming Board to issue and improper on a variety of other grounds. We analyze these two requests separately.

¶ 41    FA's first declaratory judgment request challenged the Gaming Board's authority to issue a disassociation order at all and to issue such an order against a sales agent.   Any ruling on that request would necessarily "affect the jurisdiction of the administrative agency in all cases," not just in this case (*Gallaher,* 2013 IL App (1st) 122969, ¶ 19), and thus the request fell within the facial-challenge exception to the exhaustion requirement.   At oral argument, the Gaming Board conceded this point.   Accordingly, we affirm the trial court's finding that it had jurisdiction to entertain FA's request for a declaratory judgment regarding the Board's authority to issue a disassociation order against a sales agent and its denial of the Board's motion to dismiss that portion of count V.

¶ 42    However, this holding does not resolve the real issue in this case: whether, having ruled that the Gaming Board possessed the statutory authority to issue Video Gaming Rule 330 and to issue a disassociation order against a sales agent, the trial court was then obliged to dismiss the remainder of count V, requiring FA to seek review of the Disassociation Order first through the administrative process.   That is, was FA's second request for declaratory judgment—on the validity of the Disassociation Order itself—subject to the exhaustion requirement, or did it fall within some exception to that rule?

¶ 43                      D. The Validity of the Disassociation Order

¶ 44    FA argues that the trial court had jurisdiction to consider the validity of the Disassociation Order because FA alleged that the Gaming Board exceeded its statutory authority in issuing that Order.   Thus, FA argues, its request that the trial court declare the Disassociation Order void falls within the facial-challenge exception to the exhaustion requirement.   We disagree.

¶ 45    To state a claim that an administrative order is void on its face, the agency's lack of statutory authority to enter the order must be apparent from the language of the order and the

relevant statute. See *Masterson*, 188 Ill. 2d at 555; *Emerald*, 346 Ill. App. 3d at 25. Here, though, nothing in the actual language of the Disassociation Order suggests that it is beyond the Gaming Board's power as conferred by the Act. As noted earlier, the Act gives the Gaming Board broad authority to supervise video-gaming operations and " 'to provide for the prevention of practices detrimental to the public interest and for the best interests of video gaming.' " *J&J Ventures Gaming*, 2016 IL 119870, ¶ 3 (quoting 230 ILCS 40/78 (West 2014)). Nothing in the language of the Order is contrary to this grant of statutory authority. Even the language barring Accel from making "any additional payments" to FA is not, on its face, contrary to the Board's statutory authority.

¶ 46    The problem identified by FA is that, under the factual circumstances of this case, the language of the Order might have the effect of reaching payments that are arguably beyond the scope of the Board's power to regulate, either because they are unrelated to gambling or because they are for services or goods provided by FA before the entry date of the Order. This, however, does not amount to a facial challenge to the Order. Rather, this is a claim that the Order, as applied to the specific contractual relationships between Accel and FA in this case, is overbroad or otherwise improper.

¶ 47    Such an as-applied challenge to an administrative order is subject to the exhaustion requirement, and thus it must be raised in administrative proceedings, not directly in judicial proceedings. *Newkirk*, 109 Ill. 2d at 40 (if the order is not, on its face, beyond the agency's statutory authority to issue, it cannot be collaterally attacked in court and instead must be challenged through administrative procedures); see also *Arvia v. Madigan*, 209 Ill. 2d 520, 528 (2004) (distinguishing between facial and as-applied challenges). " '[W]here it is alleged that a statute [(or, similarly, an administrative order)] valid upon its face is applied in a discriminatory or arbitrary manner, the rule generally prevails that recourse must be had in the first instance to

the appropriate administrative board.' " *Arvia*, 209 Ill. 2d at 530 (quoting *Bank of Lyons v. County of Cook*, 13 Ill. 2d 493, 495 (1958)). The trial court erred in finding that it had jurisdiction to rule on the validity of the Disassociation Order under the facial-challenge exception.

¶ 48    FA also argues that the validity of the Disassociation Order was properly determined by the trial court because there were no factual issues to be resolved and no need for agency expertise. See *Canel v. Topinka*, 212 Ill. 2d 311, 321 (2004). The trial court agreed with this premise, believing that there were no relevant facts in dispute and no occasion for the Gaming Board to apply its expertise. This conclusion was erroneous.

¶ 49    The Gaming Board notes that FA itself conceded that certain facts are in dispute by formally denying certain statements in the Disassociation Order. Specifically, FA's responses to the Order noted that Grap had yet to be convicted of the criminal charges against him and denied that Accel's disassociation from FA was necessary to protect the integrity of video gaming in Illinois. We agree that the resolution of Grap's charges is certainly a relevant undetermined fact. And the issues of whether disassociation is necessary to uphold the goals of the Act and, if so, the proper scope of that disassociation are mixed questions of fact and law that likewise must be addressed first by the Gaming Board. As the Gaming Board points out, it has not yet had the opportunity to determine how best to protect gaming in Illinois in the specific circumstances of this case, which involve contractual obligations arguably unrelated to gaming: it did not know about all of the agreements between Accel and FA when it issued the Order, and it has not been able to hear evidence or modify the Order since then, because the administrative proceeding was stayed at FA's request. Thus, we agree with the Gaming Board that this case involves issues of fact and mixed fact and law that are properly addressed first through administrative proceedings.

¶ 50    We also note that the trial court's foray into weighing the validity of the Disassociation Order seems to have resulted in conclusions not necessarily supported by the record. For instance, the trial court stated that "most of the money" owed to FA was not gaming-related, but the record suggests that the opposite might be true: payments due under the referral contract (which were based on FA's obtaining sites for video gaming) accounted for about half of the amount that FA claimed was due. Indeed, as much as 96% of the claimed damages could be considered gaming-related, depending on whether one views the promissory note as a gaming-related debt flowing from unpaid obligations under the referral contract and views payments under the ATM agreement as gaming-related based on the contract's possible purpose of supplying additional cash to video-gaming sites. Of course, we do not make any factual findings on these points, nor do we mean to suggest how such determinations should be made. We merely point out that the trial court erred in making such determinations of fact, or mixed fact and law, to begin with. Once the trial court resolved the purely legal question of the Board's statutory authority to issue a disassociation order against a sales agent, it was obliged to dismiss the remainder of count V so that FA could pursue its administrative remedies.

¶ 51    We note that FA devotes several pages of its brief to arguing a separate issue: that the trial court erred in ruling that the Board had the power to issue a disassociation order against a sales agent. That issue is not before us in this appeal. Although the trial court ruled against FA on this issue, thereby effectively denying one portion of FA's motion for summary judgment (*supra* ¶ 24), FA did not file any cross-appeal. Accordingly, the trial court's ruling that the Board had statutory authority to adopt Video Gaming Rule 330 and to issue a disassociation order against a sales agent such as FA is not before us. See *Cincinnati Insurance Co. v. Chapman*, 2016 IL App (1st) 150919, ¶ 27 ("Where a general decision for the appellee contains

findings unfavorable to the appellee and no cross-appeal is filed, the adverse findings are not properly before the reviewing court."). We therefore disregard FA's arguments on this issue.

¶ 52        E. Reasons for Requiring the Exhaustion of Administrative Remedies

¶ 53    It is tempting, in a case like this where one portion of the complaint is properly within the trial court's power to resolve, to think that the trial court should simply proceed to resolve the rest of the case as well for reasons of judicial economy. But this line of thinking ignores the fundamental fact that courts do not have jurisdiction to review administrative orders except as provided by statute. See *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 334 (2002) (although a trial court's subject matter jurisdiction generally is conferred by our state constitution, its power to review administrative action is conferred wholly by statute). Under the Administrative Review Law, administrative orders must be final and administrative remedies must be pursued and exhausted before such orders can receive judicial review. 735 ILCS 5/3-102 (West 2016) ("Unless review is sought of an administrative decision within the time and in the manner herein provided, the parties to the proceeding before the administrative agency shall be barred from obtaining judicial review of such administrative decision."). "[W]here the Administrative Review Law is applicable and the circuit court may grant the relief a party seeks within the context of reviewing the agency's decision, a circuit court has no authority to entertain independent causes of action regarding the agency's actions." *Arvia*, 209 Ill. 2d at 532. Thus, once the trial court here resolved the legal challenge properly presented in the requests for declaratory judgment, it had no jurisdiction to proceed further to review the Disassociation Order itself.

¶ 54    Even if the jurisdictional bar did not exist, the rule requiring the exhaustion of administrative remedies serves important interests. As our supreme court has explained, exhaustion allows the facts to be fully developed before the agency, allows the agency to apply

its particular expertise, and spares courts from unnecessary judicial review by allowing for the possibility that the aggrieved party might succeed before the agency. See *Allphin*, 60 Ill. 2d at 358; *Emerald*, 346 Ill. App. 3d at 25. All of these interests are served in this case by requiring FA to proceed with its challenge to the Order first within the bounds of the pending administrative proceeding.

¶ 55    Finally, there is one more reason to require the dismissal of the remainder of count V. Here, FA combined a proper request for declaratory judgment on a legal issue with an improper request for judicial review of an administrative order, all within a single count. We cannot say whether this approach was an innocent mistake or an intentional attempt to make an end run around the exhaustion requirement by confusing the trial court, but either way it was improper and cannot be condoned in the name of "judicial economy." The trial court's lack of jurisdiction to review the Disassociation Order itself could not be cured by combining a request for such review with a legitimate declaratory judgment claim.

¶ 56                                III. CONCLUSION

¶ 57    For all of these reasons, the February 1, 2017, order of the circuit court of Winnebago County is affirmed in part and reversed in part. We affirm that part of the order denying the dismissal of count V only to the extent that the count sought declaratory judgment on the issue of the statutory authority of the Gaming Board to adopt Video Gaming Rule 330 and to issue a disassociation order against a sales agent such as FA. As to the remainder of count V, we reverse the trial court's grant of summary judgment in favor of FA and its denial of the motion to dismiss, and we dismiss the count.

¶ 58    Affirmed in part and reversed in part.