**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1)

2019 IL App (3d) 160473-U

Order filed October 22, 2019

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2019

| | | |
|---|---|---|
| NEXT DOOR STORAGE, LLC and WOLF ROAD STORAGE, LLC, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiffs-Appellants and Cross-Appellees, | ) ) ) ) | |
| v. | ) ) | Appeal No. 3-16-0473 Circuit No. 10-L-393 |
| DSW ENTERPRISES, LLC; DANIEL S. WHEATON; KEITH J. WARPINSKI and WHEATLAND STORAGE, INC., | ) ) ) ) | |
| Defendants-Appellees and Cross-Appellants. | ) ) ) | Honorable Roger D. Rickmon, Judge, Presiding. |

JUSTICE WRIGHT delivered the judgment of the court.
Justice Lytton concurred in the judgment.
Justice Holdridge dissented.

**ORDER**

¶ 1    *Held*:    The trial court did not err by finding defendants-sellers breached the purchase agreement. However, the trial court erred in determining the measure of plaintiffs-purchasers' damages and that plaintiffs-purchasers were not entitled to reasonable attorney's fees.

¶ 2        Plaintiffs-appellants, Next Door Storage, LLC and Wolf Road Storage, LLC purchased land from defendants-appellees, DSW Enterprises, LLC, Daniel S. Wheaton, Keith J. Warpinski, and Wheatland Storage, Inc. Plaintiffs-appellants brought an action against defendants-appellees in the circuit court of Will County for breach of contract, negligent misrepresentation, and fraud. After a bench trial, the trial court found defendants-appellees breached the purchase agreement, plaintiffs-appellants failed to prove damages, and neither party was entitled to attorney fees. Both parties appeal.

¶ 3                                  I. BACKGROUND

¶ 4                              A. The Purchase Agreement

¶ 5        On October 24, 2008, plaintiffs-appellants (plaintiffs-purchasers) and defendants-appellees (defendants-sellers) executed a purchase agreement for land, used for self-storage and outdoor storage. The sale price was $3,859,750. In the purchase agreement, the land is identified as two separate tracts with unique common addresses and PINs. Tract I, the unimproved northern tract, is approximately 2 ½ acres. Tract II, the improved southern tract, is approximately 5 acres. The unimproved northern tract and the improved southern tract were purchased by Wolf Road Storage and Next Door Storage, respectively. Philip Murphy signed the purchase agreement as owner of plaintiffs-purchasers. Daniel Wheaton and Keith Warpinski signed the purchase agreement as owners of defendants-sellers.

¶ 6        The purchase agreement included certain warranties, representations, and covenants of defendants-sellers. Specifically, the purchase agreement, in pertinent part, provided:

          "7.10 Restrictions Applicable to Properties. Sellers have not received

          notice of and have no knowledge of any *** ordinance *** or public or private

          restriction applicable to the [tracts] *** which would in any way limit or impede

2

Purchasers' intended use of the [tracts] for self storage facilities."

¶ 7      Also, the affidavit of defendants-sellers was attached to the purchase agreement and delivered to plaintiffs-purchasers at closing on November 18, 2008. The affidavit again identified the tracts by unique common addresses and PINs. In pertinent part, the affidavit of defendants-sellers states:

"12. Neither the Sellers nor Seller's [*sic*] agent has received any notice from any city, village, or other governmental authority of any violation of any applicable dwelling or building code, or any other law or regulation."

¶ 8                         B. Initiation of Lawsuit by Plaintiffs-Purchasers

¶ 9      Plaintiffs-purchasers filed a first amended complaint against defendants-sellers on October 25, 2010, alleging breach of contract, negligent misrepresentation, and fraud. In the first amended complaint, plaintiffs-purchasers alleged Warpinski contacted Murphy to discuss Murphy's interest in purchasing the unimproved northern tract and improved southern tract. The improvements on the southern tract consisted of eight buildings and parking for outdoor storage. The amended complaint alleged Warpinski told Murphy that the applicable zoning for the improved southern tract permitted the construction of three additional buildings and 32,000 square feet of building space. In addition, Warpinski allegedly represented that Will County previously approved defendants-sellers' plans for the construction of a 27,000 square foot building and parking lot situated on the unimproved northern tract.

¶ 10     After closing on November 18, 2008, the first amended complaint alleged the applicable zoning for the improved southern tract would not permit the construction of three additional buildings, as Warpinski represented to Murphy, because the existing improvements to the southern tract already violated Will County's 50% lot coverage ordinance. Further, constructing

3

three additional buildings on the improved southern tract would further exceed the 50% lot coverage ordinance. Plaintiffs-purchasers alleged that, unbeknownst to them, the improved southern tract borrowed lot coverage from the unimproved northern tract to comply with the lot coverage ordinance and Warpinski falsely claimed Will County approved the construction of the 27,000 square foot building on the unimproved northern tract. Plaintiffs-purchasers sought $2,000,000 for defendants-sellers' breach, as well as attorney fees.

¶ 11                                    C. The Bench Trial

¶ 12        A bench trial began on July 13, 2015.[1] The bench trial was preceded by defendants-sellers' answer and affirmative defenses, lengthy discovery, and motions for summary judgment.

¶ 13                                    1. Rodney Tonelli

¶ 14        Rodney Tonelli, an expert certified land planner, testified that Will County rezoned the unimproved northern tract and improved southern tract to industrial (I1) in 2000. At that time, Will County also granted a special use permit allowing self-storage on the tracts. According to Tonelli, the applicable ordinance allowed each I1 zoned tract to have up to 50% lot coverage.[2]

¶ 15        Tonelli reviewed defendants-sellers' construction plans for the tracts that were prepared in 2000 (2000 construction plans).[3] As part of his review, Tonelli calculated the lot coverage of the tracts. Tonelli testified that, if defendants-sellers' 2000 construction plans were completed, the unimproved northern tract and improved southern tract would have 23.12% and 66.30% lot coverage, respectively. The tracts would have 51.92% combined lot coverage. According to

---

[1]The bench trial spanned a period of one month. On August 17, 2015, defendants-sellers filed a motion for directed verdict. The motion was denied as to lot coverage issues under count I, breach of contract. The motion was granted as to outdoor storage issues under count I. Since outdoor storage issues are not presented on appeal, they will not be discussed. We consider only lot coverage issues. The motion for directed verdict was also granted as to counts II and III, negligent misrepresentation and fraud.

[2]The lot coverage of a tract includes all impervious surfaces, *i.e.*, principal buildings, accessory structures, and paved driveways. "Paved" includes asphalt, gravel, bricks, and asphalt grindings.

[3]See plaintiffs-purchasers' exhibit 27.

4

Tonelli, the improved southern tract's 66.30% lot coverage would be noncompliant with the lot coverage ordinance. However, to receive zoning approval, the improved southern tract could borrow lot coverage from the unimproved northern tract. Thus, the defendants-sellers' 2000 construction plans contemplated approximately 50% combined lot coverage.

¶ 16 Even though Tonelli's calculations yielded 51.92% combined lot coverage under defendants-sellers' 2000 construction plans, Tonelli agreed the 2000 construction plans were "presumably *** in compliance with" the lot coverage ordinance. Tonelli elaborated, "[i]f [Will County] issued permits on it, [Will County] found it to comply with the rules that were in place."

¶ 17 Tonelli also reviewed defendants-sellers' construction plans for the tracts that were prepared in late 2007 and early 2008 (2008 construction plans). Initial versions of the 2008 construction plans were revised after a review by Will County.[4] Once finalized, the 2008 construction plans contemplated 64.32% and 66.30% lot coverage on the unimproved northern tract and improved southern tract, respectively. Together, the tracts would have 65.65% combined lot coverage, and would violate the lot coverage ordinance. Defendants-sellers did not go forward with executing the 2008 construction plans.

¶ 18 Next, Tonelli reviewed an American Land Title Association (ALTA) survey prepared for defendants-sellers before closing on November 18, 2008. The survey depicted the current state of the tracts. According to Tonelli, nothing was built on the unimproved northern tract, so there was zero lot coverage. The improved southern tract had a maximum capacity of 65.26% lot coverage. Tonelli said the improved southern tract was borrowing lot coverage from the unimproved northern tract. The 2000 construction plans were only partially completed, so the survey indicated less than 50% combined lot coverage on the tracts, as to comply with the ordinance.

---

[4]See plaintiffs-purchasers' exhibits 29, 30, and 31.

¶ 19    Tonelli concluded that the tracts, while comprised of two separate legal parcels, are considered one for purposes of reviewing conformance with the zoning requirements. Tonelli reasoned that the 2000 rezoning application, and the ordinance granting the rezoning, treated the tracts as one.[5] Further, the improved southern tract's compliance with the lot coverage ordinance depends on "limited development to the [unimproved] norther[n tract]." Tonelli agreed it was "probably true" a lay person could not discern the tracts were treated as one for zoning purposes.

¶ 20    Tonelli also concluded "[a]ll versions of [construction] plans *** analyzed for the subject property demonstrate a lot coverage ratio in excess of the maximum [allowed] ratio of fifty percent." Even if an administrative variance was granted by Will County to allow up to 60% lot coverage, only the 2000 construction plans would meet that requirement. The 2008 construction plans would require a formal variance.

¶ 21                                    2. Philip Murphy

¶ 22    Murphy testified that he first discussed the potential purchase of the unimproved northern tract and the improved southern tract with defendant-seller, Warpinski, on September 1, 2008. According to Murphy, Warpinski was unsure whether he wanted to sell the unimproved northern tract or keep that tract for future development. According to Murphy, Warpinski did not inform Murphy that the tracts must be sold together. In fact, Murphy said all options were on the table— buy the improved southern tract, buy the unimproved northern tract, or buy both tracts.

¶ 23    As Murphy weighed his options, he frequently visited the tracts. During one visit, Murphy became aware that defendants-sellers were advertising their plans for the construction of a 27,200 square foot building for office, retail, or warehouse space on the unimproved northern tract. Murphy believed that at that time, defendants-sellers were going to construct the building.

---

[5]The two tracts were linked to the same stormwater management system. According to Tonelli, "[a]s soon as one tries to separate the [unimproved] norther[n tract], then the complications start."

6

¶ 24　　　　On September 3, 2008, Murphy and his father met defendants-sellers, Warpinski and Wheaton, to discuss the sale of the tracts. Murphy quickly explained to defendants-sellers that buying the unimproved northern tract and the improved southern tract would allow him to "build the property and realize *** added value." Murphy intended to expand the self-storage buildings on the tracts and believed expandability was critical to the sale price.

¶ 25　　　　At the September 3, 2008, meeting, Murphy said defendants-sellers presented their 2008 construction plans to Murphy, which included the above-described 27,200 square foot building. The plans were used by defendants-sellers as an indication of what plaintiffs-purchasers could potentially construct on the unimproved northern tract. According to Murphy, defendants-sellers indicated they had already done a review with Will County and the building was ready for construction. Murphy stated there were never conversations with defendants-sellers about the unimproved northern tract's linkage to the improved southern tract for zoning purposes. By the end of the meeting, the parties signed a short form agreement for the sale of both tracts.

¶ 26　　　　Shortly after the meeting, Murphy visited the Will County Land Use Department to confirm the tracts' zoning and special uses. The Land Use Department provided Murphy with a Rider 412, which confirmed he was permitted to maintain a self-storage business on the tracts. Around this time, Murphy also learned that defendants-sellers owned the tracts through separate entities. Defendants-sellers indicated this was necessary for Will County to approve their plans for development on the tracts and that common ownership would limit those plans. Thus, Murphy bought the tracts through separate entities, Next Door Storage and Wolf Road Storage.

¶ 27　　　　Prior to closing on the tracts on November 18, 2008, Murphy met with Jeff Allen of GeoTech, Inc.[6] Murphy wanted to determine what could be built on the unimproved northern tract and how that tract could be expanded. According to his testimony, Murphy brought

_____

[6]GeoTech, Inc. prepared all of the construction plans at issue in this case.

defendants-sellers' 2008 construction plans, received during the September 3, 2008, meeting, to the meeting with Allen. Murphy also brought his own conceptual plans, which were developed by looking at defendants-sellers' 2008 construction plans "to understand *** what *** [Will C]ounty has allowed to be built."

¶ 28 At the November meeting between Murphy and Allen, Allen brought up the 50% lot coverage ordinance. Murphy also learned of the possibility of obtaining variances for the tracts. Murphy believed the tracts were separately owned, so the unimproved northern tract could be developed to 50 to 60% lot coverage. In December 2008, after the parties closed on the tracts, Allen provided construction plans to Murphy. The plans contemplated 60% lot coverage.

¶ 29 In March 2009, plaintiffs-purchasers applied for a building permit on the unimproved northern tract. With the application, plaintiffs-purchasers submitted Allen's December 2008 construction plans, modeled after the 2008 construction plans defendants-sellers provided to Murphy. In April 2009, Will County denied the building permit for the unimproved northern tract due to lot coverage issues. Will County suggested that plaintiffs-purchasers apply for a variance allowing 60% lot coverage. In July 2009, plaintiffs-purchasers sought, and in October 2009 received, an 80% lot coverage variance.

¶ 30                                    3. Brian Radner

¶ 31 Brian Radner, a certified land planner and the director of the administration and planning division of the Will County Land Use Department, met Murphy at the Land Use Department in January 2009. Radner indicated to Murphy that, due to the lot coverage ordinance, Murphy could not develop the unimproved northern tract to the extent anticipated by Murphy. According to Radner, Murphy was "quite upset" when he learned that the tracts were treated as one lot for zoning purposes and that additional zoning was necessary for the development of the

8

unimproved northern tract. Further, Radner stated defendants-sellers also had discussions with Will County about developing the unimproved northern tract separately from the improved southern tract. According to Radner, defendants-sellers' 2008 construction plans would not comply with the lot coverage ordinance and would require a variance from Will County.

¶ 32                             4. Defendant-Seller Daniel Wheaton

¶ 33        Wheaton testified that he was made aware of the lot coverage ordinance by GeoTech in 2000. GeoTech advised Wheaton of the square footage he could put on the tracts, the lot coverage limitations of the ordinance, and the potential need of the improved southern tract to borrow lot coverage from the unimproved northern tract.

¶ 34        Wheaton stated that in order to construct the 27,200 square foot building proposed in the 2008 construction plans for the unimproved northern tract, defendants-sellers would have forgone constructing the remaining buildings contemplated on the improved southern tract under the 2000 construction plans. The square footage from the buildings not constructed under the 2000 construction plans would be added to the unimproved northern tract for the construction of the 27,200 square foot building. Wheaton said defendants-sellers discussed with GeoTech the lot coverage issues of developing the unimproved northern tract under the 2008 construction plans, namely, that the 2008 construction plans contemplated 65.5% combined lot coverage.

¶ 35        When attending preapplication meetings concerning defendants-sellers' 2008 construction plans, Wheaton testified that Will County did not indicate the plans would violate the lot coverage ordinance. However, Wheaton agreed the 2008 construction plans necessitated a variance. Defendants-sellers did not file a formal application for the 2008 construction plans or any plans other than the 2000 construction plans.

¶ 36　　Wheaton believed he provided the 2000 construction plans to Murphy at the September 3, 2008, meeting between the parties but did not believe he brought the 2008 construction plans to the meeting. At the meeting, Wheaton recalled discussing what defendants-sellers intended to do on the tracts, what plaintiffs-purchasers could potentially do with the tracts, the price of the tracts, and the tracts' lot coverage under the 2000 construction plans.

¶ 37　　　　　　　　　　　　　5. Defendant-Seller Keith Warpinski

¶ 38　　Warpinski, a commercial real estate broker, testified that he believed the 27,200 square foot building proposed for the unimproved northern tract in the 2008 construction plans was permitted without further zoning approval. However, Warpinski admitted these plans resulted in 65.5% combined lot coverage on the tracts and necessitated a variance.

¶ 39　　Warpinski placed an advertisement for the sale of the unimproved northern tract separately from the improved southern tract. Warpinski assumed, since the tracts had separate PINs, the tracts could be sold separately. Further, defendants-sellers were trying to market the tracts in any way that would generate interest among purchasers. Warpinski did not investigate potential problems arising from separately selling the tracts.

¶ 40　　An email between Warpinski and Murphy on September 1, 2008, indicated Warpinski informed Murphy that the tracts could accommodate an additional 32,000 square feet of lot coverage. Warpinski arrived at 32,000 square feet by totaling the square footage of the buildings not completed on the tracts under the 2000 construction plans. However, Warpinski did not inform plaintiffs-purchasers that an additional 32,000 square feet of lot coverage required plaintiffs-purchasers to sacrifice certain lot coverage allocated to outdoor storage on the tracts.

¶ 41　　Warpinski denied advising Murphy to buy the unimproved northern tract separately from the improved southern tract. On cross-examination, however, Warpinski agreed that he provided

separate prices to Murphy for the tracts—$3,500,000 for the improved southern tract and $700,000 for the unimproved northern tract.

¶ 42                                      6. Jeff Allen

¶ 43        Allen, a former engineering director at GeoTech, testified that he drew the 2000 construction plans for defendant-sellers. In drawing those plans, Allen considered the tracts as one lot for purposes of the 50% lot coverage ordinance and discussed with defendants-sellers the avenues for complying with and expanding the permissible lot coverage under that ordinance.

¶ 44        Allen also reviewed defendants-sellers' 2008 construction plans. Allen confirmed these plans contemplated a 27,200 square foot building on the unimproved northern tract and 65.5% combined lot coverage on the tracts. On cross-examination, Allen agreed the changes between late 2007 and early 2008 to defendants-sellers' 2008 construction plans revealed defendants-sellers were exploring options for treating the tracts separately. Allen's understanding was that defendants-sellers were seeking a variance for the 2008 construction plans.

¶ 45        Allen confirmed he had a preclosing meeting with Murphy in mid-November, 2008. Allen and Murphy discussed multiple existing plans for the tracts, including defendants-sellers' 2000 and 2008 construction plans. Further, they discussed existing development, stormwater detention, and Will County lot coverage requirements. Specific to lot coverage, Allen and Murphy discussed the 50% lot coverage ordinance and the possibility of variances being granted for the tracts. Allen's recollection was that these discussions regarded the tracts as a whole.

¶ 46        At the preclosing meeting, Murphy instructed Allen to draw construction plans for the unimproved northern tract. Those plans, which were subsequently drawn by Allen and presented to Murphy, contemplated 60% lot coverage on the unimproved northern tract. Allen believed Murphy was trying to separate the tracts and stated he was directed to maximize lot coverage.

11

¶ 47                                    7. Janet Sallander

¶ 48        Janet Sallander, plaintiffs-purchasers' expert real estate appraiser specializing in self-storage facilities, generated a report on the retrospective market value of the tracts under different scenarios as of October 24, 2008, when the parties executed their purchase agreement.

¶ 49        First, Sallander assumed (1) the unimproved northern tract was an independent parcel that could be developed with additional self-storage to approximately 65% lot coverage, as was contemplated by Tonelli for the defendants-sellers' 2008 construction plans and (2) income from outdoor storage continued on the tracts. These assumptions resulted in Sallander's opinion that the tracts were worth a total of $3,775,000 as of October 24, 2008.

¶ 50        Second, Sallander assumed (1) the unimproved northern tract had limited development potential due to its linkage to the improved southern tract under the 50% lot coverage ordinance and (2) income from outdoor storage continued on the tracts. These assumptions resulted in Sallander's opinion that the tracts were worth a total of $3,375,000 as of October 24, 2008.

¶ 51                                    8. Joseph Shetina

¶ 52        Defendants-sellers called Joseph Shetina, an expert real estate appraiser, to refute the testimony of plaintiffs-purchasers' expert, Sallander. Shetina opined that he did not believe Sallander's retrospective market valuations of the tracts fairly represented the 2008 market or the value of the ongoing self-storage business on the tracts. Instead, Shetina believed the value projected and agreed upon by the parties at closing was the correct value for the tracts.

¶ 53                                    D. Trial Court Findings

¶ 54        The trial court received written closing arguments on August 26, 2015, and then took the matter under advisement. On January 26, 2016, the trial court entered its judgment, finding:

"[T]he accuracy of Defendants' representations relating to lot coverage issues made by the sellers, at the time of closing, in Seller's [*sic*] affidavit, was not as easily ascertainable. The Court is of the opinion that there was a breach of contract resulting from certain inaccuracies in that affidavit."[7]

¶ 55 With respect to damages, the trial court found plaintiffs-purchasers "ultimately realized" their intended use of the tracts once Will County "quickly granted" a variance. Thus, the trial court found plaintiffs-purchasers corrected any deficiencies arising from defendants-sellers' misrepresentations within "3 months of the filing of an application with the [C]ounty." The trial court rejected plaintiffs-purchasers argument that damages should be calculated as the difference between the price paid at closing for the tracts and the fair market value of the tracts at the time of defendants-sellers' breach, $484,750 ($3,859,750 - $3,375,000 = $484,750).

¶ 56 Instead, the trial court measured damages based on plaintiffs-purchasers' "cost to mitigate" the deficiencies arising from defendants-sellers' misrepresentations, namely, the actual costs plaintiffs-purchasers paid to obtain a lot coverage variance for the tracts. However, the trial court found plaintiffs-purchasers failed to prove damages under this measure of damages. The trial court concluded by stating judgment "is entered in favor of the Defendants[-sellers]."

¶ 57 On February 23, 2016, defendants-sellers filed a petition for attorney fees pursuant to section 10.12 of the purchase agreement. Section 10.12, in pertinent part, states:

"Should either party employ attorneys to enforce any of the provisions hereof, the party losing in any final judgment agrees to pay the prevailing party all reasonable costs, charges and expenses, including reasonable attorneys' fees."

---

[7]The trial court did not specify the provisions of the affidavit of defendants-sellers that were breached.

According to defendants-sellers, the conclusion in the trial court's January 26, 2016, order, rendered plaintiffs-purchasers "the party losing in any final judgment."

¶ 58    On April 25, 2016, plaintiffs-purchasers filed a postjudgment motion seeking damages in the amount of the difference between the sale price and the fair market value of the tracts at the time of defendants-sellers' breach. Plaintiffs-purchasers also sought an award of attorney fees under section 6.05 of the purchase agreement, which provides:

> "Sellers jointly and severally agree that they will *** indemnify the Purchasers from and against any and all costs, claims, liabilities, expenses, tax liabilities and damages, including reasonable attorney's fees, arising from *** any breach of the agreements, representations or warranties of Sellers contained in this Agreement."

Plaintiffs-purchasers argued that attorney fees were not conditioned upon proof of damages but were instead mandated as a result of defendants-sellers' breach of the affidavit of defendants-sellers.

¶ 59    On July 12, 2016, the trial court entered an order resolving all postjudgment motions. The trial court denied plaintiffs-purchasers' postjudgment motion, stating it did not err in its application of the law pertaining to damages. The trial court did not address or mention plaintiffs-purchasers' request for attorney fees under section 6.05 of the purchase agreement.

¶ 60    Further, the trial court denied defendants-sellers' petition for attorney fees, stating there was no prevailing party under section 10.12 of the purchase agreement. Rather, plaintiffs-purchasers, despite failing to prove their damages, proved defendants-sellers "made misrepresentations or inaccuracies in their affidavits."

¶ 61    The trial court also clarified that its January 26, 2016, final order and judgment was not "silent as to one of the issues necessary to a recovery under a breach of contract action." The trial

14

court reiterated that it found plaintiffs-purchasers proved the existence of a contract, plaintiffs-purchasers performed all conditions of the purchase agreement, defendants-sellers breached that purchase agreement with the misrepresentations in their affidavit, and plaintiffs-purchasers failed to prove damages under the "cost to mitigate" measurement.

¶ 62    On August 9, 2016, plaintiffs-purchasers filed a notice of appeal, challenging the trial court's denial of damages and attorney fees. On August 11, 2016, defendants-sellers filed a notice of cross-appeal, challenging the trial court's finding that defendants-sellers breached the purchase agreement and were not owed attorney fees.

¶ 63    II. ANALYSIS

¶ 64    The parties' appeals present overlapping issues for our review. For purposes of organization, we state the issues as follows: (1) whether the trial court erred in its findings on plaintiffs-purchasers' breach of contract claim and (2) whether the trial court erred by failing to award either party attorney fees. We address each issue in turn.

¶ 65    A. Plaintiffs-Purchasers' Breach of Contract Claim

¶ 66    To state a claim for breach of contract, a plaintiff must allege (1) a valid and enforceable contract exists, (2) plaintiff performed all contractual conditions under the contract, (3) defendant breached the contract, and (4) plaintiff suffered damages from defendant's breach of the contract. *Lindy Lu LLC v. Illinois Central R.R. Co.*, 2013 IL App (3d) 120337, ¶ 21. In this case, the parties raise arguments under only the latter three elements of a breach of contract claim.

¶ 67    Following a bench trial on a breach of contract claim, we weigh the trial court's judgment and findings of fact against the manifest weight of the evidence. *Meyers v. Woods*, 374 Ill. App. 3d 440, 449 (2007). A reversal is warranted where an opposite conclusion is apparent or where the trial court's findings are unreasonable, arbitrary, or unsupported by the evidence. *Id.*

15

¶ 68 The manifest weight of the evidence standard will guide our review of the trial court's factual determinations. However, aspects of our review that require an interpretation of the parties' purchase agreement or consideration of the proper measure of plaintiffs-purchasers' damages will be reviewed *de novo*. See *Sandlin v. Harrah's Illinois Corp.*, 2016 IL App (3d) 150018, ¶ 10; *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 252 (2006).

¶ 69                              1. Plaintiffs-Purchasers' Performance Under the Purchase Agreement

¶ 70 The trial court found plaintiffs-purchasers performed all conditions of the purchase agreement. Defendants-sellers cite numerous portions of the purchase agreement to show why this finding was erroneous. Initially, defendants-sellers cite section 2.02, which appears under the "contingencies" article of the purchase agreement and states plaintiffs-purchasers "may obtain inspections" to determine the availability of water and sewer supplies, the physical condition, the factors affecting development costs, and the suitability for the intended purposes of the tracts. Plaintiffs-purchasers also "shall *** have inspected the physical improvements" on the tracts.

¶ 71 The first part of section 2.02 is largely discretionary on the part of plaintiffs-purchasers. Plaintiffs-purchasers "may" obtain inspections, but such inspections are not a condition of the purchase agreement. Additionally, to the extent plaintiffs-purchasers "shall" have inspected the physical improvements on the tracts, the record demonstrates Murphy frequently visited the tracts both before and after closing, indicating compliance with section 2.02.

¶ 72 Next, defendants-sellers cite section 2.04, which is also found under the "contingencies" article of the purchase agreement. Section 2.04 states defendants-sellers, within thirty days of executing the purchase agreement, "shall" furnish "copies of applicable zoning ordinances, special use grants and any other applicable documentation evidencing that the current use of the [tracts] is permitted by the present zoning classification." This documentation is required to be

16

"in form and substance satisfactory to" plaintiffs-purchasers. The documentation must, in plaintiffs-purchasers "sole opinion," satisfy plaintiffs-purchasers as to the tracts' special uses or variances and current and intended future uses.

¶ 73    Presumably, defendants-sellers believe plaintiffs-purchasers failed to exercise diligence when reviewing the documentation referenced in section 2.04. However, section 2.04 creates a condition for defendants-sellers, not plaintiffs-purchasers. If defendants-sellers complied with section 2.04, plaintiffs-purchasers, in their "sole opinion," merely had to be satisfied that the documents indicated the tracts' special uses or variances and current and intended future uses. Given Tonelli's testimony that it was "probably true" a lay person could not discern that the tracts were treated as one combined lot for zoning purposes, it was not error for the trial court to find that plaintiffs-purchasers performed under section 2.04.

¶ 74    Further, defendants-sellers cite section 2.11 of the "contingencies" article of the purchase agreement to indicate plaintiffs-purchasers' nonperformance. Section 2.11 states if plaintiffs-purchasers determine within 45 days of the purchase agreement's execution that any "contingency or approval" has not been given by defendants-sellers, then plaintiffs-purchasers may give defendants-sellers "written notice of the deficiencies and an opportunity to correct," or give defendants-sellers "notice *** that the [purchase] [a]greement is terminated." However, "[n]otwithstanding the foregoing, if any contingency or approval *** has not been satisfied," plaintiffs-purchasers may pursue "any and all remedies available at law or in equity."

¶ 75    Here, defendants-sellers argue plaintiffs-purchasers failed to comply with section 2.11 after becoming aware of the lot coverage ordinance and the resulting complications to the prospective construction plans. Plaintiffs-purchasers deny that Murphy was aware of the lot

17

coverage issues at least 45 days after the purchase agreement's execution and, regardless, state that section 2.11 leaves open remedies at law with or without notice to defendants-sellers.

¶ 76 After reviewing section 2.11, we are persuaded by plaintiffs-purchasers' argument. Evidence in the record indicates Murphy was not aware of the lot coverage issues until January 2009, when Radner indicated that, due to the lot coverage ordinance, Murphy would not be able to develop the unimproved northern tract as anticipated. According to Radner, Murphy was "quite upset" when he learned the tracts were treated as one for zoning purposes and that additional zoning was necessary for development on the unimproved northern tract.

¶ 77 Thus, at least 69 days passed between October 24, 2008, when the purchase agreement was executed, and January 1, 2009, the earliest day Murphy could have visited the Land Use Department. Also, the last sentence of section 2.11, namely the "notwithstanding the foregoing" language, left open "all remedies available at law," with or without notice to defendants-sellers.

¶ 78 Finally, defendants-sellers invoke section 9.01 of the purchase agreement, which contemplates defaults of the purchase agreement by defendants-sellers. Section 9.01 states that if defendants-sellers "default in the performance of any of their obligations" before closing "and if such default is not cured within ten days after written notice" by plaintiffs-purchasers, then plaintiffs-purchasers shall have the right to treat the purchase agreement as being in full force and effect with the right to specific performance or to terminate the purchase agreement. If defendants-sellers' default occurs after closing "and if such default is not cured within ten days after written notice," then plaintiffs-purchasers can pursue remedies at law and equity.

¶ 79 Essentially, defendants-sellers claim plaintiffs-purchasers failed to provide notice of a default under section 9.01 within 10 days. However, defendants-sellers misread section 9.01 to create a 10-day window for notifications of a default by plaintiffs-purchasers. That section

18

contains only a deadline for defendants-sellers to cure defaults. For the foregoing reasons, the trial court's findings as to plaintiffs-purchasers' performance were not erroneous.

¶ 80                    2. Defendants-Sellers' Breach of the Purchase Agreement

¶ 81        The trial court found defendants-sellers' breach stemmed from "certain inaccuracies" relating to lot coverage in the affidavit of sellers. However, as a reviewing court, we may sustain the trial court on any grounds called for by the record, regardless of the grounds relied upon by or the reasoning of the trial court. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 97 (1995); See also *Gambino v. Boulevard Mortgage Corp.*, 398 Ill. App. 3d 21, 54-55 (2009) (applying rule to a judgment from a bench trial). Thus, we first consider whether defendants-sellers breached section 7.10 of the purchase agreement, as argued by plaintiffs-purchasers.

¶ 82                         a. Section 7.10 of the Purchase Agreement

¶ 83        The language of section 7.10 is favorable to plaintiffs-purchasers. This section warranted that defendants-sellers "have no *knowledge* of any *** ordinance *** or public or private restriction" that would "*in any way limit or impede* [plaintiffs-][p]urchasers' intended use of the [tracts] for self storage facilities." (Emphasis added.) In this case, the record on appeal, developed at the bench trial, contains overwhelming evidence that defendants-sellers knew of the lot coverage ordinance and of the limitations or impediments imposed by the lot coverage ordinance on plaintiffs-purchasers' intent to maximize the tracts' self-storage capacity.

¶ 84        In particular, by their own admission, defendants-sellers themselves encountered similar, if not identical, issues arising from the lot coverage ordinance that made the 2008 construction plans less feasible. Defendants-sellers were made aware of lot coverage issues with the 2008 construction plans when developing those plans with GeoTech and when attending preapplication meetings with Will County.

19

¶ 85    Nonetheless, defendants-sellers, at a time when they were advertising the sale of each tract separately, used their 2008 construction plans to show plaintiffs-purchasers what could be developed on the tracts. In fact, defendants-sellers delivered their 2008 construction plans to plaintiffs-purchasers during the negotiations for the tracts and indicated that those plans had been approved by Will County. All the while, defendants-sellers failed to disclose the lot coverage violations inherent in those 2008 construction plans. Namely, defendants-sellers failed to disclose that improvements to the northern tract under the 2008 construction plans, due to that tract's linkage to the improved southern tract, would violate the lot coverage ordinance without a formal variance. These facts support a finding that defendants-sellers breached section 7.10.

¶ 86                                    b. Affidavit of Defendants-Sellers

¶ 87    Next, we turn to defendants-sellers' contention that the trial court's finding of a breach under section 12 of the affidavit of defendants-sellers was erroneous. While we recognize that the trial court's explanation for this finding was sparse, we disagree that finding was wholly unsupported by the evidence presented during the bench trial. Section 12 of the affidavit of defendants-sellers provides:

> "12. Neither the Sellers nor Seller's [*sic*] agent has received any notice from any city, village, or other governmental authority of any violation of any applicable dwelling or building code, or any other law or regulation."

Defendants-sellers argue this language is truthful because they did not receive "any notice" from Will County about violations of the lot coverage ordinance. We disagree and conclude section 12 is inaccurate due to the 2008 construction plans delivered to plaintiffs-purchasers at closing.[8]

---

[8]Plaintiffs-purchasers also pointed to sections 8, 10, and 13 of the affidavit of defendants-sellers for potential breaches by defendants-sellers. Those sections provide: "8. The Properties and all improvements on the Properties are in compliance with all applicable laws, rules, regulations and ordinances, including but not limited to, setback line requirements.", "10. There are no presently existing

20

¶ 88    Contrary to section 12, defendants-sellers received notice from Will County, as well as from GeoTech, that the 2008 construction plans, as they were presently drawn, violated the 50% lot coverage ordinance without a formal variance. Despite this notice and the fact that the 2008 construction plans were used in the negotiations with plaintiffs-purchasers, defendants-sellers failed to disclose that the unimproved northern tract was linked to the improved southern tract for zoning purposes. Critically, Tonelli testified it was "probably true" a lay person would not be able to discern that the tracts were treated as one combined lot for zoning purposes. As a result, plaintiffs-purchasers relied upon the 2008 construction plans to develop their own construction plans with Allen, only to find that those plans, modeled after the 2008 construction plans, could not be completed due to the tracts being considered one combined lot for zoning purposes.

¶ 89    In our view, the trial court's findings regarding the inaccuracies contained in the affidavit of defendants-sellers indicate that the trial court believed plaintiffs-purchasers' account of how the 2008 construction plans were used during the negotiations for the tracts. Specifically, defendants-sellers used the 2008 construction plans to show how plaintiffs-purchasers could develop the unimproved northern tract after discussing the difficulties of executing those plans with GeoTech, being informed by Will County that those plans would not be approved without a formal variance, and separately advertising the tracts. Defendants-sellers even indicated the 2008 construction plans had been given the "green light" by Will County, when this was not true.

¶ 90    Clearly, under section 12, defendants-sellers received notice from Will County that the potential development of the tracts, as advertised by the 2008 construction plans, would violate the lot coverage ordinance without a formal variance. Thus, we are left with the impression that defendants-sellers used the 2008 construction plans to induce plaintiffs-purchasers to buy the

---

violations of any restrictions or easements of record affecting the Properties.", and "13. The current use of the Properties is permitted under the existing zoning laws."

21

tracts but did not reveal the violations inherent in those plans. These facts indicate the trial court's finding of a breach was not unreasonable, arbitrary, or unsupported by the record. See *Meyers*, 374 Ill. App. 3d at 449.

¶ 91                                   3. Plaintiffs-Purchasers' Damages

¶ 92         On the issue of damages, the trial court found plaintiffs-purchasers were not owed the difference between the price paid for the tracts and the fair market value of the tracts at the time of defendants-sellers' breach. Instead, the trial court found the appropriate measure of damages was "the cost to mitigate" the deficiencies arising from defendants-sellers' representations in the affidavit of sellers, *i.e.*, the cost of obtaining lot coverage variances from Will County. However, plaintiffs-purchasers failed to prove the damages owed under that measure.

¶ 93         Since defendants-sellers knew of the tracts' lot coverage limitation and the limitation's effect on the fair market value of and the intended uses for the tracts, plaintiffs-purchasers argue our court should disgorge defendants-sellers' proceeds above the fair market value of the tracts. Defendants-sellers respond that adhering to plaintiffs-purchasers' theory of damages will result in a windfall recovery. Since plaintiffs-purchasers ultimately obtained variances for up to 80% lot coverage on the tracts, defendants-sellers argue it would be improper to award plaintiffs-purchasers $484,750 for a breach resulting from inaccurate representations related to 65% combined lot coverage under the 2008 construction plans.

¶ 94         It is well settled that the measure of damages in an action for breach of a land sale contract is the difference between the contract price and the fair market value of the land on the date of the breach. *1472 N. Milwaukee, Ltd. v. Feinerman*, 2013 IL App (1st) 121191, ¶ 16 (citing *Dady v. Condit*, 188 Ill. 234, 238 (1900)). Establishing the fair market value furthers the proposition that damages should place the nonbreaching party in the same position, but not a

better position, than he or she would have been in if the contract was performed. *Id*. ¶ 17. It is the plaintiff's burden to prove damages and to establish the correct measure and computation of those damages. *Id*. ¶ 16.

¶ 95 Here, while the trial court reasoned that plaintiffs-purchasers "ultimately realized" the intended use of the tracts after a variance was "quickly granted" by Will County, we disagree, as a matter of law, that those facts alter the well-settled measure of damages for breaches of land sale contracts. In light of the nature of the breach at issue in this case, we conclude that damages in the amount of the difference between the contract price and the fair market value of the land on the date of the breach will not provide plaintiffs-purchasers with a windfall. Since the trial court used the incorrect measure of damages, we remand the matter for consideration of whether plaintiffs-purchasers, at the bench trial, proved the proper computation of damages.

¶ 96 B. Attorney's Fees

¶ 97 Regarding attorney fees, the trial court found plaintiffs-purchasers proved defendants-sellers "made misrepresentations or inaccuracies in their affidavits," constituting a breach but failed to prove the resulting damages. Thus, neither plaintiffs-purchasers nor defendants-sellers were a prevailing party entitled to attorney fees under section 10.12 of the purchase agreement.

¶ 98 Section 10.12, in pertinent part, provides:

"Should either party employ attorneys to enforce any of the provisions hereof, the party losing in any final judgment agrees to pay the prevailing party all reasonable costs, charges and expenses, including reasonable attorneys' fees."

Under this section, our reversal on the issue of damages could result in an outcome different than that reached by the trial court. Plaintiffs-purchasers could prove their damages on remand and

23

the trial court could deem them the prevailing party under section 10.12. Until the trial court has an opportunity to review this issue, questions under section 10.12 are beyond our purview.

¶ 99    However, plaintiffs-purchasers argue a different provision of the purchase agreement warrants an award of attorney fees, regardless of the ability to prove damages. Plaintiffs-purchasers point to section 6.05, which in pertinent part states:

> "Sellers jointly and severally agree that they will *** indemnify the Purchasers from and against any and all costs, claims, liabilities, expenses, tax liabilities and damages, including reasonable attorney fees, arising from *** any breach of the agreements, representations or warranties of Sellers contained in this Agreement."

Plaintiffs-purchasers argue they are owed attorney fees because nothing in section 6.05 conditions an award of attorney fees on an award of damages. We agree.

¶ 100    Here, a plain reading of section 6.05 indicates reasonable attorney fees are not contingent upon plaintiffs-purchasers' ability to prove damages or otherwise succeed on a breach of contract claim. Rather, defendants-sellers indemnified plaintiffs-purchasers' attorney fees arising from "any breach of the agreements, representations or warranties" in the purchase agreement. Since defendants-sellers breached section 7.10 of the purchase agreement and section 12 of the affidavit of defendants-sellers, they must pay plaintiffs-purchasers' reasonable attorney fees. On remand, the trial court is directed to consider whether plaintiffs-purchasers can prove their attorney fees and, if so, whether those attorney fees are reasonable.

¶ 101                                III. CONCLUSION

¶ 102    The judgment of the circuit court of Will County is affirmed in part and reversed and remanded with directions in part.

¶ 103    Affirmed in part, reversed and remanded with directions in part.

24

¶ 104 JUSTICE HOLDRIDGE, dissenting:

¶ 105 I respectfully disagree with the majority's decision in this case. In the defendants-sellers answer to the plaintiffs-purchasers' complaint, they raised an affirmative defense arguing that the plaintiffs-purchasers were aware of any alleged misrepresentations relating to lot coverage, but proceeded to purchase the tracts anyway. On appeal, the defendants-sellers raise the same argument: even if they breached the contract with respect to providing the plaintiffs-purchasers with notice of the lot coverage ordinance, any damages the plaintiffs-purchasers incurred were not a result of their alleged breach because they were aware of the lot coverage ordinance and proceeded with the closing on the tracts notwithstanding having knowledge of this information (citing *Wells v. Minor*, 219 Ill. App. 3d 32 (1991) and *Kopley Group V., L.P. v. Sheridan Edgewater Properties, Ltd.*, 376 Ill. App. 3d 1006 (2007)).

¶ 106 In *Wells*, 219 Ill. App. 3d at 45, the Fourth District discussed waiver in relation to a claim for breach of contract:

"Waiver is either an express or implied voluntary and intentional relinquishment of a known and existing right. [Citations.] An implied waiver of a legal right may arise when conduct of the person against whom waiver is asserted is inconsistent with an intent to enforce that right. [Citations.] A party to a contract may not lull another into false assurance that strict compliance with a contract duty will not be required and then sue for noncompliance. [Citation.] The analysis properly focuses on the intent of the nonbreaching party and, if he has intentionally relinquished a known right, either expressly or by conduct inconsistent with an intent to enforce that right, he has waived it and may not thereafter seek judicial enforcement. [Citation.] Where there is no dispute as to

25

the material facts and only one reasonable inference can be drawn from them, the question of waiver is a matter of law. [Citation.]"

In sum, the *Wells* court concluded that the plaintiffs waived any claim for breach of contract because they "knew of the alleged breach, decided not to take action, continued construction, and paid the bill." *Id.* Accordingly, waiver served as a defense against the breach-of-contract claim. *Id.*

¶ 107 Here, the evidence of record demonstrates that Allen discussed the lot coverage ordinances with Murphy at a preclosing meeting. *Supra* ¶¶ 28, 45-46. At that point, Murphy was aware of any inaccuracies in the defendants-sellers' notice relating to lot coverage and proceeded with the sale anyway. Therefore, in accordance with *Wells*, I would find that the plaintiffs-purchasers waived any claim for breach of contract regarding insufficient notice. For that reason, I would also find that the evidence presented did not support the trial court's conclusion and an opposite conclusion was clearly apparent. I would reverse the court's judgment, concluding that it was against the manifest weight of the evidence. Finally, based on the foregoing, I would also find that the defendants-sellers would be entitled to attorney's fees pursuant to Section 10.12 as the prevailing party in this action.