**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 200303-U

Order filed May 5, 2023

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| NEXT DOOR STORAGE, LLC, and WOLF ROAD STORAGE, LLC, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiffs-Appellees and Cross-Appellants, | ) ) ) ) | |
| v. | ) ) ) | Appeal No. 3-20-0303 Circuit No. 10-L-393 |
| DSW ENTERPRISES, LLC; DANIEL S. WHEATON; KEITH J. WARPINSKI; and WHEATLAND STORAGE, INC., | ) ) ) ) ) | Honorable |
| Defendants-Appellants and Cross-Appellees. | ) ) | Roger D. Rickmon, Judge, Presiding. |

JUSTICE DAVENPORT delivered the judgment of the court.[1]
Justices McDade and Brennan concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The trial court's determination that plaintiffs failed to prove their damages was against the manifest weight of the evidence. The amount of attorney fees awarded to plaintiffs was reasonable. Plaintiffs are entitled to their reasonable attorney fees

---

[1] This case was originally assigned to a different panel, and oral arguments were heard on December 7, 2021. On December 23, 2022, the case was reassigned to the current panel, which has listened to the oral arguments.

incurred in relation to this appeal. Affirmed in part, reversed in part, and remanded with directions.

¶ 2　　This appeal and cross-appeal—the second appeal and cross-appeal in this case (see *Next Door Storage, LLC, v. DSW Enterprises, LLC*, 2019 IL App (3d) 160473-U)—arises out of a breach-of-contract claim involving the sale of a storage business and the land upon which it operated. We must determine whether the trial court erred, on remand from our prior order, when it (1) found plaintiffs, Next Door Storage, LLC, and Wolf Road Storage, LLC, failed to prove their breach-of-contract damages; (2) awarded plaintiffs, under an indemnity provision in the parties' contract, $410,557.80 in attorney fees; and (3) denied defendants, DSW Enterprises, LLC, Daniel S. Wheaton, Keith J. Warpinski, and Wheatland Storage, Inc., fees under a prevailing-party fee-shifting provision in the contract. For the following reasons, we affirm in part, reverse in part, and remand for the trial court to award plaintiffs their reasonable attorney fees incurred in connection with this appeal.

¶ 3　　　　　　　　　　　　　　I. BACKGROUND

¶ 4　　The litigation in this case was protracted and has produced a record exceeding 4000 pages. Though the issues on appeal are limited, we set forth additional facts to provide context to the parties' contentions, borrowing from our prior decision.

¶ 5　　　　　　　　　　　　　　A. The Land

¶ 6　　The land at issue is located in unincorporated Will County. It consists of two separate, adjacent tracts, each having its own property index number (PIN). The southern tract is approximately 5 acres, and the northern tract is approximately 2½ acres. At the time of the sale, the southern tract was improved by eight self-storage buildings, a small office building, and 54 gravel parking spaces for outdoor recreational vehicle (RV) storage. The northern tract was unimproved.

¶ 7    At all pertinent times in this matter, there existed a county lot-coverage ordinance. Under the ordinance, impervious lot coverage (*i.e.*, buildings and paved areas, including gravel) is limited to 50%. A property owner can obtain an administrative variance from this limit, up to 60%. A formal variance, which requires full county board approval, is required to obtain lot coverage exceeding 60%.

¶ 8                                  B. Defendants' Purchase and Development of the Land

¶ 9    In 1999, Wheaton, a general contractor, and Warpinski, a commercial real estate broker, purchased the two tracts and later decided to develop a self-storage facility. In 2000, they engaged Geotech, Inc., to develop construction plans. The plans contemplated 11 self-storage buildings, driveways, and parking lots on the southern tract and a single 12,000 square foot building and parking lot on the northern tract. If completed, the northern and southern tracts would have 23.12% and 66.30% lot coverage, respectively. However, the southern tract "borrowed" lot coverage from the northern tract, and the tracts combined had approximately 50% lot coverage, as to comply with the lot-coverage ordinance.

¶ 10    The county approved the plans, rezoned the land to "I1" (industrial), and issued a special-use permit that allowed the operation of a self-storage business on the property. Thereafter, the county treated the two tracts as one lot for purposes of zoning, including the lot-coverage ordinance. Defendants developed the land but constructed only eight self-storage buildings and a separate, small office building on the southern tract, leaving the northern tract unimproved. Wheatland began operating the storage business in 2000, after the first buildings were constructed. At some point, it began renting gravel parking spaces for outdoor RV storage where the three never-built self-storage buildings were laid out in the plans.

3

¶ 11 In 2004, defendants received notice from the county's land use department that outdoor storage was not permitted on the land. In response, defendants obtained a temporary special-use permit allowing outdoor storage, which expired on June 1, 2005. Defendants continued outdoor storage after the permit expired but never received any additional notices of violation regarding outdoor storage or other aspects of the development.

¶ 12                    C. Defendants' Sale of the Land to Plaintiffs

¶ 13 Beginning in 2007, Wheaton and Warpinski explored options for further developing or selling the property. They engaged Geotech to prepare construction plans for the northern tract. In March 2008, Geotech delivered final construction plans to Wheaton and Warpinski. The plans contemplated a 27,200 square foot building and parking on the northern tract with 64.32% and 66.30% lot coverages on the northern and southern tracts, respectively. Combined, the tracts would have 65.65% lot coverage, meaning a formal variance would be required to go forward with the plans.

¶ 14 Defendants placed a sign on the northern tract, advertising the planned 27,200 square foot building, which could be either bought or leased and used as office, retail, or warehouse space. But defendants never sought formal approval of the plans. Instead, they marketed the land and self- and outdoor-storage business for sale. They listed each tract separately, assigning prices of $3.5 million to the southern tract and $700,000 to the northern tract. Warpinski assumed the tracts could be sold separately because the tracts had separate PINs. He did not, however, investigate potential problems that would arise from separately selling the tracts. At trial, Warpinski said he and Wheaton were marketing the property in any way that could generate interest in it.

¶ 15 In September 2008, plaintiffs' principal, Phil Murphy, and his father, Jack Murphy, took interest. According to Phil, all options were on the table—buy both tracts together or either tract

4

separately. In an email dated September 1, Warpinski told Phil, "We have built 48000 sq ft with room for an additional 32000 sq ft." At trial, Warpinski explained he arrived at 32,000 square feet by totaling the square footage of the buildings that were planned in 2000 but never constructed. He did not tell plaintiffs, however, that constructing an additional 32,000 square feet would require them to sacrifice some of the lot coverage that was used for outdoor storage.

¶ 16     Phil frequently visited the tracts as he contemplated the purchase. On one visit, he saw the advertisement for the 27,200 square foot building on the northern tract and at the time believed defendants intended to construct the building.

¶ 17     On September 3, 2008, Phil and Jack met with Wheaton and Warpinski to discuss the sale of the land and business. During the meeting, Phil told Wheaton and Warpinski that buying the unimproved northern tract and the southern tract would allow him to "build the property and realize *** added value." Phil intended to expand the self-storage capacity on the tracts and believed expandability was critical to the sale price. During the meeting, Wheaton tendered Geotech construction plans for the tracts. At trial, the Murphys testified Wheaton tendered the 2008 plans, and Wheaton testified he tendered the 2000 plans. According to Phil, defendants used the 2008 plans to show the Murphys what they could potentially construct on the northern tract and told the Murphys the county had already reviewed the 2008 plans and the building was ready for construction. Wheaton and Warpinski never told the Murphys about the zoning linkage between the tracts. The parties ultimately agreed to a price and signed a short-form agreement for the sale of both tracts.

¶ 18     After the meeting, Phil visited the land use department to confirm the tracts' zoning and special uses. The land use department provided Murphy with a "Rider 412," which confirmed he was permitted to maintain a self-storage business on the tracts. Around this time, Phil also

5

discovered that defendants owned each tract through separate entities. Defendants indicated this was necessary for the county to approve their plans and that common ownership would limit those plans. Thus, Phil bought each tract through separate entities, Next Door Storage and Wolf Road Storage.

¶ 19                                                    D. The Contract

¶ 20        On October 24, 2008, the parties executed a contract for the sale of the land and storage business. Under the contract, defendants conveyed to plaintiffs the two tracts, the improvements thereon, and the assets of the self- and outdoor-storage business. They agreed to a price of $3,859,750 and assigned specific values to certain items: (1) $114,875 for the northern tract, (2) $594,875 for the southern tract, (3) $800,000 for the existing buildings, (4) $50,000 for restrictive covenants applying to Wheaton, Warpinski, and Wheatland Storage, (5) $127,000 for Wheatland's retail inventory, furniture, fixtures, equipment, and intangible assets, and (6) $2,173,000 for Wheatland's goodwill.

¶ 21        The contract included certain warranties, representations, and covenants made by defendants. In section 7.10 of the contract, defendants warranted they "ha[d] not received notice of and ha[d] no knowledge of any *** ordinance *** or public or private restriction applicable to the [tracts] *** which would in any way limit or impede [plaintiffs'] intended use of the [tracts] for self storage facilities."

¶ 22        Before closing, Wheaton and Warpinski signed an affidavit that was incorporated into the contract. In paragraph 12 of affidavit, they represented, "Neither [defendants] nor [their] agent has received any notice from any *** governmental authority of any violation of any applicable dwelling or building code, or any other law or regulation."

¶ 23    Defendants also obtained from the county a second Rider 412, which again confirmed the current use of the property was permitted. Per the contract, they delivered the Rider 412 to plaintiffs at closing.

¶ 24    In mid-November 2008, before the closing, Phil met with Jeffrey Allen, a Geotech engineer, to determine what could be built on the northern tract. According to Phil, he brought the 2008 construction plans he received from Wheaton and Warpinski and his own conceptual plans. Allen told Phil the county's zoning ordinance prohibiting lot coverage exceeding 50% but 60% coverage was possible under an administrative variance. At trial, Phil said their discussion was limited to the northern tract, but Allen recalled that their discussion concerned the entire property. At the end of the meeting, Phil directed Allen to prepare a plan to develop the northern parcel with lot coverage not exceeding 60%.

¶ 25    The sale closed on November 18, 2008. The day before, on November 17, plaintiffs received from defendants (via the title insurer) a copy of the temporary special-use permit that allowed the outdoor storage until June 1, 2005. Plaintiffs did not raise the expiration of the permit with defendants before closing. Phil explained that he weighed the permit's stated expiration date against several other pieces of evidence which indicated outdoor storage was still permitted: (1) two Rider 412s the county had issued before closing, which stated the parcels could be used for outdoor storage and the county would honor that special use; (2) his observations that outdoor storage was ongoing at the time of the sale; (3) Wheaton and Warpinski's sworn statement (in the affidavit incorporated into the contract) that the current use of the property was permitted under the existing zoning laws; and (4) the title insurer's agreement to insure issues relating to outdoor storage.

¶ 26                                E. Postclosing Events

¶ 27        In December 2008, Allen provided construction plans for the northern tract, which contemplated 60% lot coverage, to Phil. In January 2009, Phil met with Brian Radner, a land planner and director of the administration and planning division, at the county land use department. Radner told Phil the lot-coverage ordinance prohibited him from developing the northern tract to the extent Phil anticipated. Phil became "quite upset" when he learned the tracts were treated as one lot for zoning purposes and that additional zoning was necessary to develop the northern tract. At trial, Radner recalled that defendants also had discussions with the county about separately developing the northern tract. He said defendants' March 2008 construction plans would violate the lot-coverage ordinance without a variance.

¶ 28        In March 2009, plaintiffs applied for a building permit on the northern tract, submitting the December 2008 plans. In April 2009, the county denied the application due to lot coverage issues and suggested plaintiffs apply for a variance to allow 60% lot coverage. In July 2009, plaintiffs sought and, in October 2009, received a variance permitting 80% lot coverage.

¶ 29                             F. The Amended Complaint

¶ 30        In May 2010, plaintiffs sued defendants and, in October 2010, amended their complaint. Plaintiffs alleged defendants made untrue representations that constituted a breach of the contract (count I), negligent misrepresentation (count II), and fraud (count III). Specifically, plaintiffs asserted, in part, defendants falsely represented (1) outdoor storage was a permitted use on the tracts despite the special-use permit's expiration, and (2) the two tracts were not linked for zoning purposes and could be independently developed.

¶ 31        In their affirmative defenses, defendants argued plaintiffs waived their right to recover because they knew about the lot-coverage and outdoor-storage issues but nevertheless closed the sale.

¶ 32                          G. Motions for Summary Judgment

¶ 33        After lengthy discovery—during which plaintiffs filed several motions to compel and/or

for sanctions based on defendants' failure to provide discovery—in June 2014, plaintiffs and

defendants each moved for summary judgment. Defendants sought judgment on all counts of the

amended complaint. Plaintiffs sought a finding that defendants breached the contract. After a

hearing, the trial court granted in part plaintiffs' motion and denied defendants' motion. The court

determined defendants "breach[ed] the provision of the contract relating to knowledge of zoning

restrictions and use of the property."

¶ 34                                 H. Bench Trial

¶ 35        The matter proceeded to a bench trial in July 2015. For reasons not apparent in the record,

the parties proceeded as if the trial court had not entered summary judgment on the issue of breach.

The parties presented evidence consistent with that discussed above. At the close of plaintiffs'

case, defendants moved for a directed finding on all counts of plaintiffs' complaint. The trial court

ordered the parties to submit written briefs. It later granted defendants' motion in part, finding in

defendants' favor on count I insofar as that claim was based on the expiration of the outdoor-

storage permit. In addition, the court found in defendants' favor on counts II and III. Thus, the

remaining issue to be determined was whether plaintiffs could establish a compensable breach-of-

contract claim based on the undisclosed zoning linkage between the tracts, which limited the

potential lot coverage of any development on the northern tract.[2]

_____

[2] Our discussion of the motion for a directed finding is based on our statement in the Rule 23 order
in the prior appeal, which the parties do not dispute. *Next Door Storage*, 2019 IL App (3d) 160473, ¶ 12
n.1. The record shows the trial court heard arguments on the motion on August 17, 2015, and took the
matter under advisement, telling the parties it would issue its ruling the next day in open court. The record
does not contain a report of the proceedings on August 18. Nor does it contain any written indication of the
court's ruling. However, on August 19, the court clarified its ruling, confirming that count I remained
insofar as it was related to the lot-coverage issues and not the outdoor-storage issues.

¶ 36    During trial, the parties also presented the following evidence on the issue of damages. Plaintiffs' theory was that they were entitled to the difference between the contract price and the actual fair market value of the land on the date of the contract (October 24, 2008).

¶ 37                                    1. *Rodney Tonelli*

¶ 38    Rodney Tonelli, plaintiffs' land-planning expert, reviewed and calculated the lot coverage of defendants' 2000 construction plans, defendants' March 2008 construction plans, and a survey that was prepared in advance of the closing. Tonelli testified that, if the 2000 plans were completed, the northern and southern tracts would have 23.12% and 66.30% lot coverage, respectively. Combined, the tracts would have 51.92% lot coverage. To receive approval, the southern tract could "borrow" lot coverage from the northern tract. Tonelli agreed the 2000 construction plans "presumably" complied with the lot-coverage ordinance, because the county had approved them.

¶ 39    Defendants' March 2008 construction plans contemplated 64.32% and 66.30% lot coverage on the northern and southern tracts, respectively. Combined, the tracts would have 65.65% lot coverage.

¶ 40    The survey showed nothing was ever built on the northern tract, so it had zero lot coverage. The southern tract, as improved, had approximately 65.26% lot coverage, and it was borrowing coverage from the northern tract. Because defendants did not fully complete the 2000 plans, the tracts had a combined lot coverage of less than 50%, as to comply with the ordinance.

¶ 41    Tonelli concluded that the tracts, though separate legal parcels, were treated as one parcel for purposes of zoning. Further, the southern tract's compliance with the lot-coverage ordinance depended on limited development of the northern tract. Tonelli agreed it was "probably true" a lay person could not discern the tracts were linked for zoning purposes.

¶ 42                                    2. *Janet Sallander*

¶ 43    Janet Sallander, plaintiffs' expert real-estate appraiser who specialized in self-storage facilities, provided valuation testimony. According to Sallander, an existing self-storage facility's cash flow is the most important factor when evaluating the facility because they are bought for their income potential. Thus, "[t]he value of the land by itself [was not] necessarily important," but rather, its ability to generate income.

¶ 44    Phil retained Sallander to provide a retrospective market value of the property as of October 24, 2008 (the contract date), using four different valuation scenarios that Phil provided, two of which are relevant to this appeal. Sallander reviewed information, as of the valuation date, concerning the subject property area and the market in general, facilities comparable to the subject property, and land values in the area. She also reviewed public information, including the county assessor's records, the zoning records, and the assessor's and tax records for the comparable sales and land sales. Finally, she reviewed information provided to her, including Tonelli's report, the property's September 2008 rent roll, and an appraisal prepared before the closing by Kent Steele, which contained 2008 market data. Sallander valued the property using both a sales-comparison approach and an income-capitalization approach. In reaching her ultimate conclusions, she placed more weight on the income-capitalization approach, because it is better suited for valuing self-storage facilities given its reliance on net operating income, that is, net cash flow after expenses. See Black's Law Dictionary 913 (11th ed. 2019). Sallander prepared a 142-page report detailing the bases for her conclusions.

¶ 45    In the first valuation scenario, Sallander valued the property as represented by defendants: developable to the extent contemplated in their March 2008 construction plans. Thus, she assumed (1) "[t]he RV storage income that was reported and in place as of [October 24, 2008] was legally permitted to continue, and (2) the northern tract was "excess land" that "could be sold off

11

separately or developed with additional self-storage units or other improvements," which "could have impervious lot coverage of approximately 70,785 square feet" (as calculated by Tonelli). Under this scenario, the sales-comparison approach produced a value of $3,850,000, and the income-capitalization approach produced a value of $3,750,000. Sallander opined that the value of the property was $3,775,000, which was a weighted reconciliation of those values. In reaching this conclusion, she valued the northern tract, as excess land, at $560,000. Sallander concluded, based on this scenario, the contract price ($3,859,750) was consistent with the market if the land was as represented.

¶ 46    In the second valuation scenario, Sallander valued the property as it actually was on the date of the contract: developable, per the lot-coverage ordinance, to a combined lot coverage of 50%. She again assumed the RV storage income was legally permitted to continue. However, she assumed the northern tract was "surplus land," meaning development of additional self-storage units or other improvements was "limited [by the lot-coverage ordinance] to a maximum impervious coverage of approximately 21,197 square feet." Sallander arrived at this square footage of developable space by dividing the total square footage of the two tracts in half (in accordance with the 50% lot-coverage ordinance) and subtracting what had already been built on the southern tract. Under this scenario, the sales-comparison approach produced a value of $3,450,000, and the income-capitalization approach produced a value of $3,350,000. Sallander opined the value of the property was $3,375,000, which again was a weighted reconciliation of those values. In reaching this conclusion, she again valued the northern tract, as surplus land, at $150,000.

¶ 47    Sallander explained the difference between the first and second valuation scenarios was in how the northern tract was treated. In the first valuation scenario, she treated the northern tract as if it were an independent tract, with no relation to the southern tract. In the second valuation

12

scenario, she treated the northern tract as if it were linked to the southern tract. In both scenarios, Sallander treated the southern tract the same and reached the same value conclusion.

¶ 48        Sallander acknowledged she never considered a valuation scenario in which the northern tract alone or the entire property was developed to 60% lot coverage. She did not consider a scenario in which the entire property was developed to 80% lot coverage. Nor did she consider the value of the property if it was constructed in accordance with defendants' 2000 construction plans. She agreed that she could have—"[t]he possibilities [were] endless"—but was never asked.

¶ 49        Sallander acknowledged that Kent Steele, before closing, appraised the property at $4 million. She did not rely on his valuation in forming her opinion. However, she relied on the appraisal insofar as it contained information about the 2008 market, because, at the time of trial, *i.e.*, in 2015, she could not access 2008 market information.

¶ 50        At the conclusion of Sallander's testimony, the court remarked, "very impressive."

¶ 51                                      3. *Michael Rogina*

¶ 52        Michael Rogina, an engineer and professional land surveyor, testified as an expert for defendants. Before trial, as a discovery sanction, the court limited his testimony to the information contained in his written report.

¶ 53        Rogina testified that, after the closing, plaintiffs had obtained a special-use permit allowing outdoor storage and had obtained a lot-coverage variance to 80%. Using aerial photographs of the property from 2011, he determined plaintiffs ultimately developed the northern parcel to 66% lot coverage.

¶ 54                                        4. *Joseph Shetina*

¶ 55    Joseph Shetina, a licensed real estate broker and appraiser, also testified as an expert for defendants. Before trial, as a discovery sanction, the court also limited his testimony to that which was contained in his June 4, 2015, letter to defendants' attorney. That letter read as follows:

> "I reviewed the mass of data included in the report dated October 24, 2008, with respect to the retrospective valuation of the above captioned property (including land and building comprising Next Door Storage).
>
> I do not believe this retrospective valuation fairly represents the 2008 market or does it fairly represent the value of this ongoing business as developed in the ensuing years.
>
> I do believe the value projected and agreed upon when closed is the correct value (date of closing)."

¶ 56    At trial, Shetina added that the first paragraph's reference to the "mass of data" meant that he reviewed Sallander's report, the preclosing Steele appraisal, and a retrospective appraisal prepared by Steele while the case was pending. Further, he clarified that the second paragraph stated he disagreed with Sallander's conclusions concerning the property's valuation.

¶ 57                    G. Closing Arguments and The Trial Court's Judgment

¶ 58    At the close of evidence, the parties submitted written closing arguments. On the issue of damages, defendants argued Sallander's testimony was deficient, because it was based on hypotheticals that were not in line with the evidence in the case. Specifically, defendants noted, Sallander never considered the value of the property in accord with how the northern tract was developed *after* the sale: to 66% lot coverage. Further, they maintained, awarding plaintiffs damages in accord with Sallander's testimony would provide plaintiffs a windfall, because they ultimately achieved more lot coverage than was contemplated in the first valuation scenario.

14

¶ 59    On January 26, 2016, the trial court entered a written order, finding defendants breached the contract insofar as they made untrue representations regarding lot coverage. The trial court found, however, plaintiffs failed to prove damages. Specifically, the court rejected plaintiffs' theory of damages, which was based on the well-settled rule in cases involving land-sale contracts, *i.e.*, that the proper measure of damages is the contract price minus the actual fair market value of the property. The court observed plaintiffs ultimately realized their intended use of the property when they applied for and were "quickly granted by the [c]ounty" a lot-coverage variance and special-use permit for outdoor storage. Thus, the court determined, "the appropriate measure of damages would have be [*sic*] the cost to mitigate those deficiencies." In other words, defendants should be responsible for the costs incurred by plaintiffs to obtain that variance. And though a letter stating plaintiffs had expended $44,219 to obtain the variance was admitted into evidence, there was no testimony or other evidence (such as invoices) demonstrating what work was required to obtain the variance. In ruling, the court made no mention of Sallander's or Shetina's credibility or the reliability of their testimony. Accordingly, the court entered judgment in favor of defendants.

¶ 60                               H. Postjudgment Litigation

¶ 61    Plaintiffs filed a postjudgment motion, which, in part, sought their attorney fees under section 6.05 of the contract. That section states, in pertinent part,

> "[Defendants] jointly and severally agree that they will, at all times after the Closing Date, hold harmless and indemnify [plaintiffs] from and against any and all costs, claims, liabilities, expenses, tax liabilities[,] and damages, including reasonable attorney's fees, arising from *** any breach of the agreements, representations[,] or warranties of [defendants] contained in this Agreement."

15

Plaintiffs asserted, "There is no condition in this provision that [plaintiffs] prevail in the action or establish damages." Because the court found defendants breached the contract, they argued, they were entitled to an award of reasonable attorney fees.

¶ 62        Defendants petitioned for their attorney fees under section 10.12 of the contract. That section states, in pertinent part,

> "Should either party employ attorneys to enforce any of the provisions hereof, the party losing in any final judgment agrees to pay the prevailing party all reasonable costs, charges[,] and expenses, including reasonable attorneys' fees, expended or incurred in connection therewith."

Defendants contended that, despite their breach, judgment was entered in their favor because plaintiffs failed to prove their damages, and, therefore, they were the prevailing party in the litigation and entitled to fees.

¶ 63        The court denied both parties' requests for attorney fees. It reasoned that, because plaintiffs proved a breach but failed to prove damages, neither party was a prevailing party under section 10.12 of the contract. The court did not specifically address plaintiffs' contention that they were entitled to fees, regardless of the litigation's outcome, under section 6.05 of the contract.

¶ 64                                    I. First Appeal

¶ 65        The parties both appealed from the trial court's judgment. In their appeal, plaintiffs raised two contentions: First, the court applied an improper measure of damages. Plaintiffs maintained the proper measure of damages was the contract price minus the fair market value of the land on the date of the breach. Second, the court erred when it rejected their request for attorney fees. According to plaintiffs, they were entitled to attorney fees under section 6.05 of the contract even if they were not the prevailing party under section 10.12.

16

¶ 66    In their cross-appeal, defendants raised three contentions. First, the trial court's findings that plaintiffs fully performed their duties and defendants breached the contract were against the manifest weight of the evidence. Second, they were entitled to judgment under the doctrine of waiver, because the evidence showed plaintiffs knew of the lot-coverage issues before closing but purchased the land anyway. Third, the court erred when it rejected their request for fees under section 10.12 of the contract. On this point, defendants argued that, because the court found plaintiffs had not proved damages, they were the prevailing party in the litigation and therefore entitled to fees under that section.

¶ 67    With one justice dissenting, we affirmed in part, reversed in part, and remanded with directions. We framed the issues as follows: "(1) whether the trial court erred in its findings on [plaintiffs'] breach of contract claim and (2) whether the trial court erred by failing to award either party attorney fees." *Next Door Storage*, 2019 IL App (3d) 160473-U, ¶ 64.

¶ 68    On the first issue, we concluded the trial court's findings as to plaintiffs' performance and defendants' breach (based on the lot-coverage issue) were not against the manifest weight of the evidence. *Id.* ¶¶ 83-90. Specifically, we found defendants' conduct—their failure to disclose the zoning linkage, despite their knowledge of its effect on future development, while advertising the tracts separately and using the noncompliant March 2008 construction plans, which they said had been approved, to show plaintiffs what could be built—constituted breaches under section 7.10 of the contract and paragraph 12 of the affidavit. *Id.* Accordingly, we affirmed those findings.

¶ 69    Next, we determined the trial court applied the wrong measure of damages. We observed "[i]t is well settled that the measure of damages in an action for breach of a land sale contract is the difference between the contract price and the fair market value of the land on the date of the breach." *Id.* ¶ 94. We wrote the following:

17

"Here, while the trial court reasoned that [plaintiffs] 'ultimately realized' the intended use of the tracts after a variance was 'quickly granted' by Will County, we disagree, as a matter of law, that those facts alter the well-settled measure of damages for breaches of land sale contracts. In light of the nature of the breach at issue in this case, we conclude that damages in the amount of the difference between the contract price and the fair market value of the land on the date of the breach will not provide [plaintiffs] with a windfall. Since the trial court used the incorrect measure of damages, we remand the matter for consideration of whether [plaintiffs], at the bench trial, proved the proper computation of damages." *Id.* ¶ 95.

¶ 70    Finally, we addressed the parties' requests for attorney fees, looking first to section 10.12, which required "the party losing in any final judgment *** to pay the prevailing party['s] *** reasonable attorneys' fees." We wrote, "[u]nder this section, our reversal on the issue of damages could result in an outcome different than that reached by the trial court." *Id.* ¶ 98. We explained that, if the trial court found plaintiffs proved their damages under the proper measure, the court could deem plaintiffs the prevailing party under section 10.12. *Id.* We also wrote, "[u]ntil the trial court has an opportunity to review this issue, questions under section 10.12 are beyond our purview." *Id.*

¶ 71    We then turned to plaintiffs' argument that they were entitled to their attorney fees under section 6.05 of the contract, which they contended, unlike section 10.12, did not condition an award of attorney fees on an award of damages. We agreed, explaining section 6.05 plainly stated that reasonable attorney fees were not contingent on plaintiffs' ability to prove damage or otherwise succeed on their claim. *Id.* ¶ 100. Rather, it stated defendants indemnified plaintiffs' attorney fees "arising from 'any breach of the agreements, representations[,] or warranties' in the [contract]."

18

*Id.* Because defendants breached the contract, we concluded, "they must pay [plaintiffs'] reasonable attorney fees." *Id.* Accordingly, we reversed the court's determination on plaintiffs' request for fees and directed the court "to consider [on remand] whether [plaintiffs] can prove their attorney fees and, if so, whether those attorney fees are reasonable."

¶ 72                                    J. Proceedings on Remand

¶ 73        On remand, plaintiffs moved for entry of judgment and separately petitioned for their attorney fees. In their motion, plaintiffs sought damages of $484,750, contending Sallander's testimony established the fair market value of the property as it stood on the date of the sale—*i.e.*, the northern tract's developability being limited because of its zoning linkage to the southern tract—was $3,375,000, which was $484,750 less than what plaintiffs actually paid. In their fee petition, plaintiffs sought a total of $442,240.25 of incurred attorney fees and future fees. Plaintiffs broke down their request into three categories: (1) those incurred through the end of trial, specifically, $347,107.80; (2) those incurred in relation to postjudgment litigation and appeal, specifically, $95,132.45; and (3) those incurred in relation to the postremand litigation, in an amount to be determined. They also sought a total of $20,280.67 in costs.

¶ 74        Defendants also petitioned for their attorney fees, arguing that, if plaintiffs again failed to prove their damages, they were entitled to fees under section 10.12 of the contract. Defendants sought fees totaling $205,837.80.

¶ 75        In an oral ruling, the trial court determined plaintiffs failed to prove their damages. The court explained it had reviewed its notes and relevant portions of the record, refreshing its recollection of the matter. Noting that it had the unique opportunity to hear and observe the witnesses and weigh the experts' testimony against the rest of the evidence presented, the court

19

determined plaintiffs failed to establish a difference between the contract price and actual fair market value of the properties.

¶ 76 The court then addressed attorney fees. It awarded plaintiffs, under section 6.05 of the contract, $410,557.80 in attorney fees and costs, broken down as follows: (1) $347,107.80 incurred through the end of trial; (2) $62,250 incurred during the postjudgment and appellate litigation; and (3) $1200 in attorney fees incurred during the postremand litigation.[3] The court also awarded plaintiffs $20,280.67 in costs. The court said it had looked at plaintiffs' petition, reviewed each time entry that was submitted, and found the fees sought were "eminently reasonable." With regard to the fees incurred through the end of trial, the court remarked it expected "the [fees] to have been higher," but the fees sought were nevertheless reasonable and "necessary to the successful prosecution of [the] claim." The court next addressed the fees relating to the first appeal and found the amount "to be in excessive of the amount and work necessary to perfect the appeal," noting there were some entries that were duplicative. Accordingly, the court reduced the fees from $95,132.45 to $62,250. Finally, the court denied defendants' fee petition without explanation.

¶ 77 At the end of the hearing, the court added,

> "By the way, one last thing. I want to apologize to [the parties' attorneys] and to the Appellate Court for my failure to specifically state in my original decision that I found there to be no diminution in value of this property due to the breaches. That's what I believed at the time I tried this case. I weighed Mrs. Sounders' [*sic*] testimony and her four hypotheticals and I found each of them to be defective and not consistent with the facts and just not reliable.

_____

[3] We note the written order conflicts as to the amount awarded to plaintiffs. The court's oral ruling controls over its written order. *Family Amusement of Northern Illinois, Inc. v. Accel Entertainment Gaming, LLC*, 2018 IL App (2d) 170185, ¶ 23.

I contrast that to the testimony of Mr. Shetina who has decades of experience in this county with this area and compared that to my own feelings about this lot, its location, its potential uses and found that his opinion that there was no diminution to be credible and it had a ring of truth to it. It's consistent with what I was feeling after having heard all these witnesses testify. My opinion is that [Phil] who at the time of closing knew that the lot had a 50 percent coverage issue knew what he was buying and got exactly what he was looking for, a piece of income-producing property, and I didn't really believe then nor do I believe now after reviewing this and refreshing my recollection that there was any actual diminution in value, so that's the basis of this ruling.

***. My thinking at the time I rendered this decision was there had been no diminution in value, but [plaintiffs] ought to be able to recover what it cost to get the variance. Unfortunately, there was no evidence as to that. In a way, that's a mitigation issue. I mean, they could have rescinded. They didn't. They held on to the property, they got it zoned, and I think they knew all that going into the closing. They knew what they were dealing with and knew what they were buying, so that's the basis of my ruling."

¶ 78    This appeal and cross-appeal followed.

¶ 79                                II. ANALYSIS

¶ 80    In their appeal, defendants contend the trial court's fee award to plaintiff, under section 6.05, was unreasonable. They also assert the trial court erred by denying their fee petition brought under section 10.12 of the contract. In their cross-appeal, plaintiffs contend the trial court erred when it found they failed to prove damages. They also ask us to enter an "additional judgment

21

against defendants for [plaintiffs'] reasonable attorney's fees on appeal not exceeding $25,000." We will first address the trial court's damages determination and then move to attorney fees.

¶ 81                                    A. Damages

¶ 82                    1. *The Trial Court Did Not Exceed the Scope of Our Mandate*

¶ 83        Plaintiffs initially argue the trial court exceeded the scope of our mandate. According to plaintiffs, our order "direct[ed] the [trial] court to examine plaintiffs' evidence presented at the bench trial and nothing more." But on remand, plaintiffs maintain, the trial court considered Shetina's testimony, finding it to be more credible than Sallander's testimony, and "factors never discussed or considered by Shetina, including the [court's] own feelings about the lots, plus the location [and] potential uses."

¶ 84        "[A] reviewing court's mandate vests a trial court with jurisdiction only to take action that complies with the reviewing court's mandate." *McDonald v. Lipov*, 2014 IL App (2d) 130401, ¶ 44. Stated differently, a trial court on remand lacks authority to exceed the scope of the mandate; it must obey the reviewing court's precise and unambiguous directions. *Id.* "Furthermore, the correctness of the trial court's action on remand is to be determined from the appellate court's mandate, as opposed to the appellate court opinion." *Id.* Of course, if the direction is to proceed in conformity with the opinion, the opinion's content becomes significant. *Id.* But if the reviewing court does not give specific directions, the trial court must examine the opinion to determine what further proceedings would be consistent with it. *Id.* We review *de novo* whether the trial court exceeded our mandate. *Quincy School District No. 172 v. Illinois Educational Labor Relations Board*, 366 Ill. App. 3d 1205, 1208 (2006).

¶ 85        Our mandate in the prior appeal stated the matter was "[a]ffirmed in part, reversed and remanded with directions in part." The mandate did not specify what those directions were.

22

Relevant here, our order directed the trial court to consider "whether [plaintiffs], at the bench trial, proved the proper computation of damages."

¶ 86     Plaintiffs' assertion that we directed the trial court to consider *only* their evidence reads far too much into our order. Our directions placed no limit on the evidence the trial court was to consider. The directions—to consider whether "[plaintiffs] *** proved" damages—were merely a recognition that it was plaintiffs' burden to prove damages. See *Ollivier v. Alden*, 262 Ill. App. 3d 190, 196 (1994). It is axiomatic that, when determining whether a party has met its burden of proof, the court, as finder of fact, must consider all properly admitted evidence. See Illinois Pattern Jury Instructions, Civil, No. 21.01 (2011). Thus, the trial court's consideration of all the evidence relating to damages presented at the bench trial did not exceed this court's mandate. Rather, our mandate compelled the trial court to do so.

¶ 87                    2. *The Trial Court's Determination on Damages*
                       *Was Against the Manifest Weight of the Evidence*

¶ 88     Plaintiffs next contend the trial court erred when it determined plaintiffs failed to prove damages. Specifically, they argue the trial court erred by crediting Shetina's testimony instead of accepting Sallander's testimony. Relatedly, they assert Sallander's testimony was uncontradicted, and, therefore, the trial court should have accepted her testimony and awarded plaintiffs $484,750.

¶ 89     When reviewing a bench trial, we may not disturb the trial court's judgment unless it is against the manifest weight of the evidence. *Battaglia v. 736 N. Clark Corp.*, 2015 IL App (1st) 142437, ¶ 23. A judgment is against the manifest weight of the evidence when the findings are unreasonable, arbitrary, or not based on the evidence. *Id.* Under this standard, we may not substitute our judgment for that of the trial court "regarding the credibility of the witnesses, the weight to be given to evidence, or the inferences to be drawn," and we will affirm the judgment provided the record contains any evidence supporting it. *Granville Tower Condominium Ass'n v.*

23

*Escobar*, 2022 IL App (1st) 200362, ¶ 27. In other words, "[a] reviewing court will not reverse a trial court's decision merely because different conclusions can be drawn [from the evidence]; an opposite conclusion must be clearly evident." *Walker v. Ridgeview Construction Co.*, 316 Ill. App. 3d 592, 595 (2000). This deferential standard of review is appropriate "because the trial court is in a superior position to determine and weigh the credibility of the witnesses, observe witnesses' demeanor, and resolve conflicts in their testimony." *Wade v. Stewart Title Guaranty Co.*, 2017 IL App (1st) 161765, ¶ 59.

¶ 90    Here, each party presented expert witnesses on the issue of damages. A court measures the weight of an expert's opinion by the reasons given for it and the facts gathered in its support and should give little weight when the opinion lacks a factual basis. *Temesvary v. Houdek*, 301 Ill. App. 3d 560, 568 (1998). The weight to be given expert testimony is a matter of the trial court's discretion and will not be disturbed on appeal absent an abuse of that discretion. *Id.*

¶ 91    Shetina testified he (1) reviewed Sallander's and Steele's appraisals; (2) did "not believe [Sallander's] retrospective valuation fairly represent[ed] the 2008 market, nor did it fairly represent the value of this ongoing business as developed in the ensuing years; and (3) "believe[d] the value projected and agreed upon when closed [was] the correct value" as of the date of closing. Shetina, however, never set forth the facts on which he based his opinion. And he never explained *why* he believed Sallander's appraisal was inaccurate. Given these deficiencies, Shetina's testimony was entitled to little, if any, weight, and the trial court abused its discretion by finding Shetina's testimony more reliable than Sallander's. *Id.* at 569.

¶ 92    Given the deficiencies in Shetina's testimony, Sallander's valuation testimony was essentially unopposed. When a party presents unopposed expert testimony, the trial court is not required to find in that party's favor; "it is still within the province of the [court] to weigh the

24

credibility of the expert evidence and to decide the issue." *In re Glenville*, 139 Ill. 2d 242, 251 (1990). But the court may not reject unopposed testimony arbitrarily. *Id.* The court may disregard such testimony only when it is inherently impossible, contradicted by positive testimony or circumstances, or the witness has been impeached. *Bazydlo v. Volant*, 164 Ill. 2d 207, 215 (1995).

¶ 93 When a plaintiff claims damages, the plaintiff must show he or she sustained damages resulting from the defendant's breach, establish the correct measure of damages, and provide a final computation of damages under that measurement. *1472 N. Milwaukee, Ltd. v. Feinerman*, 2013 IL App (1st) 121191, ¶ 16. The correct measure of damages in a land-sale dispute is the difference between the contract price and the actual fair market value of the land on the date of the breach. *Id.* Fair market value is the price for which a property would sell under normal circumstances, assuming the seller is willing to sell and the buyer is under no compulsion to buy. *Id.* The use of fair market value is rooted in the principle "that a damage award should place the nonbreaching party into the position he would have been in had the contract been performed" but not give the nonbreaching party a windfall. *Id.* ¶ 17.

¶ 94 "Damages should be based on some measurable criteria and not based on guess, speculation[,] or conjecture." *Id.* Absolute certainty is not required; rather, the plaintiff need only establish a reasonable basis for computing the damages. *Kirkpatrick v. Strosberg*, 385 Ill. App. 3d 119, 130 (2008).

¶ 95 Here, plaintiffs' expert witness, Sallander, was not impeached and her testimony was neither inherently impossible nor contradicted by positive testimony or circumstances. Indeed, she established a reasonable basis for computing a difference between the contract price and the property's actual fair market value. The critical component of Sallander's testimony was her testimony concerning the second valuation scenario. Under that scenario, Sallander valued the

25

property using assumptions reflecting the actual state of the property. That is, Sallander assumed the outdoor storage could continue. She also assumed the northern and southern tracts were linked under the zoning ordinance and could not be sold off or developed separately. Based on the understanding that the entire property could not be developed beyond 50% lot coverage, she determined the northern tract's development was limited to 21,197 square feet of lot coverage. Sallander's assumptions under this scenario were indisputably consistent with the facts that existed at the time of the sale. Indeed, the outdoor storage never ceased (despite it not being permitted), and the two lots were linked for zoning purposes, which, without a variance, limited the marketability and developability of the unimproved northern tract. Ultimately, Sallander opined that the actual fair market value of the property, in light of the limitations on the northern tract, was $3,375,000.

¶ 96 Sallander's first valuation scenario was relevant to establish the contract price of $3,859,750 was consistent with the market if the property had been as represented by defendants. Under this scenario, she valued the property using the lot coverage defendants represented, via their March 2008 construction plans, was possible on the northern tract. This scenario is consistent with the nature of the breach in this case. Defendants knew of the zoning linkage between the two tracts and its impact on future development yet failed to disclose it. Instead, they separately advertised the tracts and compounded their nondisclosure by tendering *noncompliant* construction plans to prospective buyers, whom they knew were looking to expand the property. See *Next Door Storage*, 2019 IL App (3d) 160473, ¶¶ 83-90.

¶ 97 Defendants nevertheless argue that we should affirm the trial court's judgment because Sallander's testimony was deficient in three respects and, therefore, the trial court could properly

26

reject it. We note that defendants did not probe these purported deficiencies on cross-examination or argue them to the trial court.

¶ 98        Defendants' first challenge to Sallander's testimony is that, in the contract, the parties assigned specific values to items transferred in the sale. Defendants maintain plaintiffs were entitled to the difference between the contract price and the actual value of the *land* involved in the transaction, but Sallander based her value opinions on the value of the land *and the operating business*. Thus, defendants assert, Sallander's valuation began from an improper starting point—the value of the land and business—and conflated a business valuation with a real estate appraisal.

¶ 99        We disagree. Defendants' argument overlooks the fact that the business and land in this case were inextricably linked. Indeed, given the nonportable nature of a self- and outdoor-storage business, the business would have little value without the land upon which it sits.

¶ 100       Moreover, defendants' argument overlooks a critical point of Sallander's testimony. In both relevant valuation scenarios, Sallander treated the southern tract the same and reached identical valuation conclusions for that tract (under both valuation approaches). Her ultimate conclusion on the difference in value was the product of how the unimproved northern tract, that is, *vacant land*, was treated. Indeed, she concluded the northern tract had a value of $560,000 under the first valuation scenario and only $150,000 under the second.

¶ 101       We acknowledge the parties, in the contract, assigned to the northern tract a specific value of $114,875, which is lower than Sallander's conclusion for that tract under either scenario. However, we do not believe this undermines her conclusion that the northern tract had less value under the second scenario than it did under the first. All other things being equal, a buyer motivated to expand and maximize cash flow from the property, like plaintiffs, would undoubtedly pay more

27

for a parcel that could be expanded to 70,785 square feet than one that could be expanded to 21,197 square feet.

¶ 102    Defendants' second challenge to Sallander's testimony is that her first and second valuation scenarios failed to account for the income received from the outdoor RV storage that never stopped, despite its illegality. The record flatly rebuts this contention. In both valuation scenarios, Sallander assumed "[t]he RV storage income that was reported and in place as of [October 24, 2008] was legally permitted to continue."

¶ 103    Defendants' final challenge to Sallander's testimony is that she failed to account for the possibility of rezoning. In support, they rely on the general rule in condemnation proceedings which permits the fact finder to consider the probability of rezoning when determining just compensation, provided there is sufficient evidence on the issue. See *Department of Public Works and Buildings v. Association of Franciscan Fathers*, 69 Ill. 2d 308, 315 (1977). Defendants have provided us with no citation of authority extending this principle to cases involving a breach of a land-sale contract. But even assuming this principle extends to the case at bar, we reject defendants' argument.

¶ 104    "As a general rule, the probability of rezoning or other governmental relief is admissible if the prospect is sufficiently likely so as to have an appreciable influence upon present market value." *Lake County Forest Preserve District v. Petersen*, 93 Ill. App. 3d 731, 734 (1981). "The test is considered satisfied in rezoning cases when the evidence shows rigid zoning requirements have been relaxed by municipal authorities which indicated a degree of flexibility." (Internal quotation marks omitted.) *Id.* at 734-35.

¶ 105    Defendants rely on the evidence which showed the property was eventually rezoned to allow lot coverage of up to 80%. The fatal flaw in defendants' argument is that this evidence does

not reflect the mindset of either party or the flexibility of the zoning requirements when they were negotiating the sale. See *id.* at 734 (the rationale underlying the rule allowing this evidence is that the fact finder should consider what private parties would consider when *negotiating the sale*).

¶ 106    In its original judgment, the court never mentioned the experts' testimony, Sallander's or Shetina's credibility, or the reliability of their testimony. Rather, it found plaintiffs sought the wrong measure of damages because they ultimately achieved the zoning they desired. Nearly four years later, the trial court for the first time said it found Sallander's testimony was unreliable because it was not based on evidence, without identifying what in her testimony it believed was deficient. And for the first time, the court said it found Shetina's testimony more credible on the ultimate issue to be decided—that the fair market value of the real estate was not diminished as a result of the zoning linkage—even though Shetina never set forth a factual basis for his opinion or explained why he came to that conclusion.

¶ 107    We acknowledge the standard of review requires us to afford deference to the trial court's determinations as to credibility and the weight to be given to evidence, as well as its ultimate judgment in a bench trial, given its unique opportunity to view the witnesses and observe their demeanor. See *Wade*, 2017 IL App (1st) 161765, ¶ 59. But, as noted above, Sallander's essentially unopposed testimony was consistent with the facts presented, and the court's credibility findings were made long after the trial's conclusion. Under these circumstances, we conclude the trial court arbitrarily rejected Sallander's testimony (which it had described earlier as "very impressive"), and its determination that plaintiffs failed to prove damages was against the manifest weight of the evidence. Accordingly, we reverse this portion of the trial court's judgment.

¶ 108    We decline, however, to remand the matter to the trial court for it to award damages to plaintiffs. Because the record clearly establishes the right to and amount of damages, we exercise

29

our authority under Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994) and enter judgment in favor of plaintiffs in the amount of $484,750 ($3,859,750 (contract price) - $3,375,000 (fair market value) = $484,750).

¶ 109                                          B. Attorney Fees

¶ 110        In their appeal, defendants challenge the trial court's attorney fee determination. Specifically, they contend the trial court erred by denying their fee petition, because plaintiffs failed to prove damages and, as a result, they were entitled to attorney fees as the prevailing party under section 10.12 of the contract. They also contend the trial court's fee award—which essentially awarded plaintiffs all the fees they sought—was unreasonable, because the award was not limited to the fees plaintiffs incurred to prove a breach per section 6.05 of the contract. Additionally, they argue the fees were unreasonable because plaintiff could have proved defendants' breach by simply asking the court to take judicial notice of the county ordinances.

¶ 111        Given our determination that plaintiffs, in fact, proved their damages, we need not determine whether defendants were entitled to fees as the prevailing parties under section 10.12 of the contract. Our determination on the issue of damages means that *plaintiffs* were the prevailing parties under that section and, accordingly, were entitled to "all reasonable costs, charges[,] and expenses, including reasonable attorneys' fees, expended or incurred in connection" with this litigation. Moreover, our determination on the issue of damages obviates the need to address defendants' argument that plaintiffs were entitled, under section 6.05 of the contract, only to those fees incurred in proving the breach. Thus, our review is limited to whether the trial court's fee award was reasonable.

¶ 112        The determination of whether attorney fees are reasonable is a matter for the trial court's discretion. *McHenry Savings Bank v. Autoworks of Wauconda, Inc.*, 399 Ill. App. 3d 104, 113

30

(2010). When making this determination, a court should consider "the nature of the case, the novelty and difficulty of the case, the skill and standing of the attorneys, the degree of responsibility required, the usual and customary charges in the community for similar work, and the connection between the case and the fees charged." *Id.* We will not disturb a fee award unless the trial court has abused its discretion. *Id.* An abuse of discretion occurs when no reasonable person would adopt the trial court's view. *Bangaly v. Baggiani*, 2014 IL App (1st) 123760, ¶ 126.

¶ 113    In their fee petition, plaintiffs sought $442,240.25 in incurred attorney fees and future fees, categorizing their request as follows: (1) $347,107.80 incurred through trial, (2) $95,132.45 incurred in relation to postjudgment litigation and the first appeal, and (3) an indeterminate amount incurred in relation to the postappeal litigation. They attached to their petition a log of all the attorney fees incurred and expended on the case, which set forth the attorney who performed the work, the time expended, the rate charged, and a detailed description of the work performed. They also attached an affidavit from their attorney, who averred that the entries on the log were made contemporaneously with the work performed, the hours worked were "appropriate and commensurate with the demands of this case," the fees incurred were "reasonable and appropriate and, further, [were] commensurate with the experience of the attorneys working on the file," and the hourly rates charged were "typical for this type of work in Will County."

¶ 114    The record shows that the trial court considered the applicable factors, meticulously reviewed each time entry on the log attached to plaintiffs' fee petition, and carefully exercised its discretion in finding the fees sought by plaintiff were "eminently reasonable." With respect to the first category—the fees incurred through trial—the court found the fees reasonable and necessary to the successful prosecution of the claim and, in fact, "expect[ed] the charges to have been higher." With respect to the second category—the fees incurred in relation to the postjudgment

31

litigation and appeal—the court found the fees exceeded the "amount and work necessary to perfect the appeal," noting that some of the work performed was duplicative. Accordingly, the court reduced the fees sought from $95,132.45 to $62,250. With respect to the third category—the fees incurred in relation to the postremand litigation—the court awarded plaintiffs $1200, which it determined by multiplying four hours of attorney time (for preparing the fee petition) by a rate of $300 per hour.

¶ 115 Defendants nevertheless argue the fees incurred by plaintiffs were not reasonable. They assert "[p]roving that the written warranties were in conflict with public ordinances [was], quite frankly, a routine legal undertaking which [did] not require the expenditure of over 1,200 hours of lawyer time." They maintain plaintiffs could have proved their breach by asking the trial court to take judicial notice of the applicable zoning on the property and compare it to the written warranties and representations in the contract.

¶ 116 We disagree that proving plaintiffs' claim was a routine legal undertaking. This was a complex case. We further disagree that plaintiffs' attorneys expended an unreasonable amount of time on it. At the time the trial court awarded plaintiffs their fees, the litigation had been pending for more than 10 years. Defendants at all times disputed their liability on the claim and denied they breached the contract or made inaccurate representations in the incorporated affidavit. They unsuccessfully moved for summary judgment on all counts of plaintiffs' amended complaint, and the matter proceeded to an eight-day trial, at which 13 witnesses, 4 of whom were experts, testified and over 1000 pages in exhibits were admitted. Moreover, the record shows the significant delay in this case was caused in part by defendants' dilatory discovery practice, which required plaintiffs to file several motions to compel, resulted in orders limiting their experts' testimony, and needlessly increased litigation costs.

32

¶ 117    Given the record before us, we agree with the trial court's findings that the fees sought by plaintiffs were "eminently reasonable." Accordingly, we conclude the trial court did not abuse its discretion by awarding plaintiffs $410,557.80 in attorney fees.

¶ 118                    C. Plaintiffs' Request for Attorney Fees Relating to This Appeal

¶ 119    As a final matter, plaintiffs ask us to award them attorney fees that they incurred in relation to this appeal. We agree that plaintiffs are entitled, under section 10.12 of the contract, to their reasonable attorney fees incurred in connection with this appeal. See *Erlenbush v. Largent*, 353 Ill. App. 3d 949, 953 (2004). However, because the amount of fees on appeal are more properly determined upon a petition and hearing in the trial court, we decline their request. See *id.* Instead, we remand the matter to the trial court to determine the amount of the fees reasonably incurred in connection with this appeal.

¶ 120                                III. CONCLUSION

¶ 121    For the reasons stated, we reverse in part and affirm in part the judgment of the circuit court of Will County, and we remand the matter for the trial court to award plaintiffs their reasonable attorney fees incurred in connection with this appeal.

¶ 122    Affirmed in part; reversed in part; remanded with directions.

33